NATIONAL CABLE TELEVISION
ASSOCIATION, INC., et al.,
Plaintiffs,

v.

BROADCAST MUSIC, INC., Defendant.

BLACK ENTERTAINMENT
TELEVISION, INC.,
Plaintiff,

v.

BROADCAST MUSIC, INC., Defendant.

Civ. A. Nos. 90–0209, 90–0262.

United States District Court,
District of Columbia.

Aug. 16, 1991.

Music performing rights licensing organization and affiliated music publishers did not engage in copyright misuse in their relationship with cable programmers, such that programmers would have defense to claims of infringement for unlicensed broadcasting, given determination that no antitrust violation was established and absence of any showing that licensing organization somehow illegally extended its monopoly or otherwise violated public policy underlying copyright law.

**616**

Kim Hoyt Sperduto, Weil, Gotshal & Manges, Washington, D.C., R. Bruce Rich, Beth K. Neelmon, Joseph P. Salvo, Ira M. Millstein, Evie C. Goldstein, Kenneth L. Steinthal, New York City, for plaintiffs.

Robert J. Sisk, Michael Salzman, Norman C. Kleinberg, Hughes, Hubbard & Reed, Charles Lozow, Mary K. Fleck, George A. Tsougarakis, New York City, William R. Stein, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

In these consolidated cases, plaintiffs, two cable television program services and trade associations representing cable program services and cable television system operators, assert antitrust claims against the defendant, Broadcast Music, Inc. ("BMI"), in connection with music performing rights licenses issued by BMI. BMI, in turn, along with several affiliates, counterclaims against the two program service plaintiffs for copyright infringement. These matters were heard by the Court in a bench trial comprising three weeks of live testimony, several additional hours of videotaped witnesses, as well as thousands of documentary and videotape exhibits. Based on the findings of fact and conclusions of law set forth below, the Court enters judgment against plaintiffs and for defendant and counterclaim plaintiffs.

## I. BACKGROUND

This suit was brought by the National Cable Television Association, Inc. ("NCTA"), Community Antenna Television Association, Inc. ("CATA"), Black Entertainment Television, Inc. ("BET"), and The Disney Channel ("TDC") against Broadcast Music, Inc. ("BMI"). Collectively, plaintiffs represent the different components of the cable television industry. NCTA is the principal trade association of the cable television industry, whose members consist of cable program services and cable system operators. CATA is also a trade association for the cable television industry whose members include cable system operators and cable program services as well; its membership overlaps with NCTA's. TDC operates a pay cable television program service that, *inter alia*, acquires, markets, and transmits cable programming. BET

operates a basic cable television program service that, like TDC, also acquires, produces, markets, and transmits programming.

Defendant and counterclaim-plaintiff BMI is a nonprofit corporation formed in 1939 by radio broadcasters that is a music performing rights licensing organization within the meaning of the Copyright Act, 17 U.S.C. § 116(e)(3). Along with its major competitor, the American Society of Composers, Authors and Publishers ("ASCAP"), and other smaller entities, most notably the Society of European Stage Authors and Composers, Inc. ("SESAC"), BMI licenses the performing rights in the copyrighted musical compositions of its affiliated [1] composers, songwriters, and music publishers. BMI has more than 110,000 affiliates and its repertory comprises over two million copyrighted musical compositions.[2] Pursuant to form affiliation agreements, BMI affiliates grant to BMI the non-exclusive right to license the performing rights in their existing and future copyrighted musical compositions and to sue on their behalf for infringement of those rights. In return, BMI monitors the use of affiliates' music and pays them royalties.[3]

### A. Historical Background

Music performing rights societies were formed as a means of dealing with the difficulties of composers in obtaining compensation for the use of their music and in enforcing their copyrights.[4] "[T]hose who performed copyrighted music for profit were so numerous and widespread, and most performances so fleeting, that as a practical matter it was impossible for the many individual copyright owners to negotiate with and license the users and detect unauthorized uses." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc. ("BMI v. CBS")*, 441 U.S. 1, 4–5, 99 S.Ct. 1551, 1554–55, 60 L.Ed.2d 1 (1979).

At issue here is the legality of what is known as "blanket licensing," the practice of BMI (as well as ASCAP and SESAC) whereby the licensee obtains the right to unlimited use of all the compositions in the BMI repertory for a specific period for a specific fee, the latter usually based on a percentage of the licensee's gross revenue. Thus, the license fee does not directly depend on the amount or type of music used, or the way in which the music is used.

Blanket licensing has been the subject of antitrust litigation for nearly sixty years, beginning with a criminal complaint filed against ASCAP in 1934. In 1941, the United States brought suit against ASCAP's blanket licensing—at that time, exclusive licensing—charging that it was an illegal restraint of trade and that ASCAP constituted an illegal copyright pool. As a result of the litigation, a consent decree was imposed in 1941. *United States v. ASCAP*, 1940–43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y.1941). The consent decree was substantially amended in 1950, largely as a result of complaints by the emerging television industry and a successful challenge by motion picture theaters. J1[5] (*United States v. ASCAP*, 1950–51 Trade Cas. (CCH) ¶ 62,594 (S.D.N.Y.1950)). The amended consent decree allows ASCAP to obtain only nonexclusive performing rights

---

**1.** ASCAP composers, authors and publishers are "members" of ASCAP.

**2.** ASCAP has a larger repertory and larger membership than BMI, such that the two societies have in the past agreed to share fees from the Copyright Royalty Tribunal at a ratio of 55% (ASCAP) to 45% (BMI). *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 568 n. 10 (2d Cir.1990).

**3.** Through reciprocal agreements with foreign music performing rights societies, BMI also collects and distributes to its affiliates royalties for performances abroad.

**4.** Copyrights are not self-enforcing rights.

**5.** The following abbreviations shall be used to identify the different evidentiary sources admitted at trial:

Joint Stipulation of Facts—"J.S."
Joint Ownership Stipulation—"O.S."
Joint Exhibit—"J"
Plaintiffs' Exhibit—"P"
Defendant's Exhibit—"D"
Trial transcript—"Tr."
Witness Video Transcript—"[name] V.Tr. ([exhibit no.])"
Deposition transcript—"[name] Dep."
Deposition transcripts from *BMI v. Home Box Office, Inc.* ("HBO"), 89 Civ. 8579 (S.D.N.Y. Dec. 28, 1989)—"[name] HBO Dep."
*HBO* Hearing Transcript—"[name] HBO Tr."

from its members, and requires ASCAP to grant any user a nonexclusive license to perform all ASCAP compositions either for a specific period or on a per-program basis. Furthermore, ASCAP may not demand that a user obtain a blanket license. BMI has been similarly subject to the constraints of a consent decree. *See United States v. BMI*, 1940–43 Trade Cas. (CCH) ¶ 59,096 (E.D.Wis.1941); J2 (*United States v. BMI*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y.)). The consent decrees do differ in some material respects. Most significantly, ASCAP's decree provides for a "rate court": if ASCAP and an applicant for a license disagree as to a fee, the applicant may petition the rate court (the United States District Court for the Southern District of New York) for a determination of a reasonable fee. ASCAP must then grant a license at the court-determined rate. BMI has no such rate court, nor any other compulsory licensing mechanism. *See generally BMI v. CBS*, 441 U.S. at 11–12 & n. 20, 99 S.Ct. at 1558 & n. 20. BMI has asked the U.S. Department of Justice for an amendment to its consent decree to provide for a rate court, but its request was denied. *See* J3, J4.

Apart from the consent decrees entered into with the United States, BMI's and ASCAP's blanket licenses have suffered but ultimately survived a number of antitrust challenges by private litigants. *See Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers*, 400 F.Supp. 737 (S.D.N.Y.1975), *rev'd*, 562 F.2d 130 (2d Cir. 1977), *rev'd sub nom. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (*"BMI v. CBS"*), *on remand* 620 F.2d 930 (2d Cir.1980) (*"CBS Remand"*), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981); *Buffalo Broadcasting Co. v. American Society of Composers, Authors and Publishers*, 546 F.Supp. 274 (S.D.N.Y.1982), *rev'd*, 744 F.2d 917 (2d Cir.1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985). In *BMI*

*v. CBS*, the Supreme Court held that the issuance by ASCAP and BMI to CBS of blanket licenses at negotiated fees is not a *per se* restraint of trade in violation of the Sherman Act, and remanded to the Court of Appeals to assess the practice under the "rule of reason." The Second Circuit accordingly examined whether, on the record presented, the blanket license, on its face and as applied, was a restraint on trade. Upholding the district court's finding that proof of a restraining effect was lacking, the court concluded that the blanket license did not violate § 1 of the Sherman Act. 620 F.2d at 938–39. In *Buffalo Broadcasting*, a challenge brought by local television stations to ASCAP's blanket license, the Second Circuit reversed the district court's determination that the blanket license was an unreasonable restraint on trade in that context, holding that it was not such a restraint where there were realistically available alternatives.[6]

## B. The Cable Industry and Music Use

To understand the contentions in this litigation requires, in addition to historical background, an examination of the different components of the cable television industry and how it acquires and uses copyrighted music.

### 1. Structure of the Cable Industry

There are two tiers of the cable industry represented in this action: cable program services (also referred to herein as programmers) and cable system operators. The cable program services represented here are: First, TDC, a pay cable program service, which means that it usually does not carry commercial advertisements. Its services (programming) are sold to subscribers by cable system operators for a monthly fee (in addition to the basic cable fee subscribers pay to cable system operators for basic cable services). Like all pay cable program services, TDC's sources of revenue include a share of the cable operators' monthly charges, i.e. subscription fees

---

**6.** For an account of other conflicts and lawsuits between BMI and other media, *see* J3, attachment at 11–20 (February 1987 draft memoran-

dum in support of BMI's motion to modify the 1966 Consent Decree).

charged by system operators to home viewers for the pay service. The second cable programmer represented here is BET, which is a basic cable program service. Basic cable program services do transmit commercial advertisements as part of their programming. Basic cable programming is sold by cable system operators to subscribers as part of the subscription fee for receipt of a package of cable television services—in other words, without additional charge. Basic cable program services obtain their revenue from advertisements and from a certain portion of the subscription fees paid by the cable system operators for carrying the basic services' programming.

The other component of the cable industry represented here consists of cable system operators. They transmit programming from four principal sources: broadcast television stations, distant broadcast television stations furnished via satellite (known as superstations), local origination programming (programming produced by the system operators), and basic and pay cable program services. Cable system operators obtain their revenues from their share of subscription fees [7] as well as from the leasing of access to their systems for programming and advertising from local origination programming and basic cable services. Many of the thousands of local system operators are part of larger multiple system operators ("MSOs").

Cable television transmission is accomplished as follows.[8] Cable program services transmit programming regionally or nationally via satellite or overland microwave. The programming reaches viewers (subscribers) in one of two ways. The majority of cable television appears on the screen via satellite transmission from the program services to cable television system "headends" owned by cable system operators.

The system operators then retransmit the programming to subscribers on the same lines (wire or fiber optic cable) through which they transmit broadcast television and their own (local origination) programming. A very small percentage of subscribers receive the cable program services directly on their own home dish antennas (and pay fees directly to the program services). These two methods of transmission are used by both pay cable services and basic cable services.

## 2. Program Production and Music Licensing

Virtually every type of programming shown on cable television uses music in some manner. Such music is of three types: theme music, used either to introduce or close a program; background music, used to complement the visual action; and feature music, music that is the principal focus of a program, *e.g.*, in a music variety show. J.S. ¶ 40; Tr. at 1734–36. *See generally Buffalo Broadcasting,* 546 F.Supp. at 281; *CBS Remand,* 620 F.2d at 933.

To use music as either theme, background, or feature in programming, producers must obtain the rights from the composers and publishers of the music. Producers either engage a composer to write original music for the program (arrangements known as "composer for hire" agreements), or obtain a license to preexisting music from a music publisher [9] or its agent. The music composer or the composer's agent negotiates the price of a bundle of music rights; [10] mechanical rights (the right to make a mechanical reproduction of the music), print rights (the right to publish the sheet music), grand performance rights (the right to hold dramatic performances of music such as operas and musicals), and,

---

**7.** Cable operators' share of revenue from subscribers can amount to 85% of the subscription fees received for basic cable services and 50% of the additional fees charged for pay cable services. Tr. at 476–82.

**8.** For a more complete description of the transmission process, see J12 (Affidavit of Robert M. Zitter, Vice President of Network Operations for Home Box Office, Inc.).

**9.** Publishers commercially exploit the copyrights of the music in their catalogs, licensing the various rights to encourage maximum use of their music. J.S. ¶ 92.

**10.** *See* 17 U.S.C. § 106 (distinct rights recognized by the Copyright Act).

most relevant here, synchronization rights, the right to record or synchronize the music with the visual image or other aural aspects of the program.[11] These rights are granted (usually as a package) to the producer for a negotiated fee.

The one right that is not granted to producers (other than producers of motion pictures for theatrical performance [12]) is the non-dramatic performing right (hereinafter "performing right"), that is, the right to publicly perform the music. The performing rights to music owned by BMI affiliates are generally licensed through BMI and not to the producer but to the ultimate "performer," such as a broadcast or cable television entity. This distinction means that while the price of all other music rights is negotiated directly between the producer and the composer and entails the granting of those rights from the latter to the former, performing rights most often are separately obtained from BMI—usually through the blanket license at issue here.

### 3. Programming

Two main types of programming are carried by cable program services: original programming and syndicated programming. Original programming is that produced by the cable service itself or by independent producers specifically for the service. Most cable program services, including TDC and BET, transmit some original programming. These programs range from full-length movies to regular programs to promotional announcements and commercials. Approximately 25% of TDC's programming consists of such original ma-

terials.[13] With regard to this component of programming, then, the program service acts as a producer and thus selects the music content.

Syndicated programming includes any pre-recorded theatrical motion picture, videotape, or other recorded work (such as broadcast television series and music videos) offered for sale or license by third-party distributors, producers, or syndicators. This previously produced programming comprises the majority of programming carried by cable program services such as plaintiffs TDC and BET.[14] Several of plaintiffs' witnesses testified that the quantity and quality of the syndicated programming they transmit is critical to effective competition with other cable program services.[15]

What plaintiffs are challenging here is the blanket licensing system that is applied to syndicated programming on cable television, and, in particular, the time in the process when music performing rights are acquired. Virtually all syndicated programming contains copyrighted music, a large percentage of which is in the BMI repertory. The music is selected by the producer of the syndicated program and synchronized in the program soundtrack at the time the program is created. Accordingly, when the syndicated program is sold or licensed to the cable program services, the music is "in the can," i.e. indelibly part of the program. That means that cable program services do not play any role in the selection of or negotiation over the bundle of music rights described above con-

---

**11.** The Harry Fox Agency, which represents most major music publishers, serves as the primary agency for the licensing of television synchronization rights.

**12.** When the producer of a motion picture created for theatrical release employs pre-existing music, the agreement covering use of the music provides for both synchronization *and* performing rights. The difference stems from the motion picture industry's successful suit against ASCAP. *Alden–Rochelle, Inc. v. ASCAP*, 80 F.Supp. 888 (S.D.N.Y.1948). This proscription was later embodied in ASCAP's 1950 consent decree (J1 Art. V(C)), and since then neither

ASCAP nor BMI licenses movie theaters for music in the pictures they exhibit. J.S. ¶ 123. The performing right extends only to exhibitions in movie theaters, however; it does not include performing rights for television transmission of the movie.

**13.** Rider V.Tr. (P 375A) at 14.

**14.** For example, approximately 70% of BET's programming is acquired. Tr. at 710–11.

**15.** *E.g.,* Rider V.Tr. (P 375A) at 12–14; Cooke V.Tr. (P 377A) at 11–12, 24–25.

cerning syndicated programming.[16]

Most standard form agreements entered into between syndicators (or other preexisting program producers) and cable program services provide that the programmers cannot alter any aspect of the syndicated product. *E.g.*, P 50D ¶ 7 (TDC agreement with MGM/UA Telecommunications, Inc., Jan 15, 1990) ("You will not authorize any third party to, nor will you yourselves, cut, edit, delete from, add to, or alter the Film without our consent."); P 51E ¶ 11 (BET agreement with Columbia Pictures Television, Aug. 28, 1985, for a television series) ("BET shall telecast each episode in its entirety...."). These contracts also contain representations and warranties that the copyright rights attached to the programs elements have been obtained by the producer or distributor, and the latter thereby indemnify the licensee against any claims based thereon—except for music performing rights. *E.g.*, P 50D ¶ 7 ("We warrant that we own or control all rights (except ... nondramatic musical performing rights) in the Film...."); P 51E ¶ 7(b) (Contractor represents and warrants that "the Series licensed herein do not, and that the exercise by BET ... of the rights herein granted will not [ ] infringe upon the common law rights, or the copyright, or the literary, dramatic, music or motion picture rights of any person...."). As for music performing rights, the agreements provide that the music performing rights controlled by a music performing rights society must be paid for by the acquirer of the programming. *E.g.* P 50D ¶ 7; 51E ¶ 9.

The relationship between cable program services and system operators is governed by similar contractual terms. System operators, usually at the MSO level, enter into affiliation agreements with programmers for the right to exhibit that service's programming. These agreements generally prohibit system operators from editing, deleting, or altering any of the programming content. *E.g.*, P 53C ¶ 6(b) (TDC–Adelphia

Communications, 1983); P 53 E ¶ 6(b) (TDC–Cablevision Industries, Inc., 1983); P 54G ¶ 4(c) (BET–American Television & Communications Corp., 1989); P 54 L ¶ 4(c) (BET–Falcon Cablevision, 1989). *See generally* Tr. at 426–27; 682–83; 747–751; Whalen V.Tr. (J16) at 24–28. The agreements also have standard representations and warranties indemnifying the system operators against any claims of infringement concerning the program elements in programming, but in most instances, these provisions do not include music performing rights. *E.g.* P 53C ¶ 8(a); P 53A Art. 8.01; P 54G ¶ 8(d)(ii); P 54L ¶ 8(d)(ii). It is evident that without music performing rights, cable television cannot lawfully transmit programming containing copyrighted music.

In addition to original and syndicated programming carried by the cable program services, cable system operators also transmit their own programming (local origination programming), as well as public access programming. Local origination programming carried by cable system operators represents only a fraction of the total programming operators offer. It consists primarily of local news shows, talk shows, and other programs that use little or no music. Like cable program services' original programming, system operators' control of local origination programming is such that they can select the music they use and can acquire the applicable music performing rights independent of BMI.[17]

The salient fact derived from this structure, according to plaintiffs, is that cable program services (and cable operators) have no control over the music in the vast majority of the programming they transmit as part of their service. The prevailing industry practice is that music performing rights are not conveyed and must be obtained from the copyright holder or his or her agent in order to perform the music in the program. In addition, cable program

**16.** *See, e.g.,* Tr. at 302–08, 722; Rider V.Tr. (P 375A) at 24–25.

**17.** System operators thus usually obtain representations and warranties from the users of public access and leased access channels that the users have all rights required for the system operator to exhibit the program lawfully without further obligation on the part of the system operator.

services do not obtain the right to alter or delete the music in syndicated programming. As a result, under the copyright laws, cable program services cannot lawfully transmit any syndicated programming containing music from the BMI repertory without a license from BMI. Without the licenses, then, syndicated programing would be commercially valueless to cable program services.

The gravamen of plaintiffs' argument is that cable program services are forced to obtain the blanket license from BMI in order to transmit syndicated programming, the mainstay of their program offering. Cable system operators as well must have some sort of license to transmit copyrighted music. Interestingly, as to noncable program service programming, these matters are taken care of in different ways. Broadcast television networks and local stations (whose programming is often transmitted by cable operators) have licenses governing music performing rights.[18] Furthermore, by statute, cable system operators receive compulsory blanket licenses at fees set by the Copyright Royalty Tribunal for distant broadcast (superstation) transmissions. 17 U.S.C.A. § 111(d) (West Supp.1991). As for the remaining two types of programming, local origination and cable program services (or networks), licensing is unresolved,[19] and it is the failure of BMI and the cable industry to reach agreement on the issue that led to this litigation. The focus of plaintiffs' challenge is BMI's demand for a blanket license for syndicated programming on cable television; they do not challenge the license with respect to local origination programming or programming made expressly for first exhibition on cable television.

## C. Music Licensing History of the Cable Industry

To understand the posture of this case, and the contour of the Court's inquiry, a review of the history of music licensing in the cable industry is helpful. Until December 31, 1989, licenses granted by BMI to cable program services were "through to the viewer," covering both the services' satellite and microwave transmission to system operators and home dish owners, and the retransmission of the programming by system operators to subscribers. Under this licensing regime, cable system operators did not need their own licenses for BMI music contained in programming obtained from cable programmers because their performances of that music were covered by the programmers' licenses.[20]

During the 1980s, the cable industry expanded and matured. For example, from 1985 to 1990 subscriptions grew from 32 million to approximately 53 million households; between 1984 and 1989 total cable television subscriptions rose by 35.5%, and the average revenues per subscriber increased from $19.87 to $26.36. U.S. General Accounting Office, Telecommunications: Follow–Up National Survey of Cable Television Rates and Services (Report to the Chairman, Subcommittee on Telecommunications and Finance, Committee on Energy and Commerce, House of Representatives GAO/RCED–90–199, June 13, 1990), at 57, 59 (D 596). As of the mid–1980s, BMI had entered into blanket license agreements with five major pay cable program services (including TDC),[21] three basic cable program services owned and operated by MTV Networks, Inc., and a variety of smaller

**18.** Licenses for public television stations are governed by proceedings before the Copyright Royalty Tribunal. J.S. ¶ 53.

**19.** The parties stipulated that system operators, through plaintiffs NCTA and CATA, have "consistently" but unsuccessfully sought a blanket license arrangement with BMI for BMI music in the local origination and public access programming they transmit. J.S. ¶ 55.

**20.** The three major broadcast television networks have through-to-the-viewer licenses from BMI authorizing performances of BMI music in

network programming by both the networks and their affiliated local television stations. Fees for these licenses are flat-sum dollar amounts that apparently total less than 0.3% of the networks' revenues. E.g., P 83, P 84 (BMI–ABC Network license agreement dated Jan. 1, 1988, effective through 1993).

**21.** E.g., P 2A (BMI–TDC license agreement, May 27, 1986); P 7A (BMI–Country Music Television license agreement, Oct. 8, 1987); P 9A (BMI–HBO license agreement, Nov. 30, 1978).

cable networks. The fees for these licenses were either flat dollar sums or, in the case of some pay cable program services, calculated at the rate of $0.12 per subscriber, never amounting to more than 0.3% of the pay cable services' revenues. The majority of cable programming services (and all cable operators) are unlicensed at this time.

BMI characterizes these license fees as "start-up" rates. BMI's Vice President and General Counsel, Marvin Berenson, testified that BMI believed that these rates were not keeping up with the types of revenues the cable industry is garnering. Tr. at 2284–85. BMI accordingly sought higher fees. During 1988 and 1989, BMI offered through-to-the-viewer blanket licenses to BET and three other cable program services at a fee equivalent to one percent of each service's annual revenues.[22]

A more important point of contention between the cable industry and BMI that hampered their ability to reach agreement was what BMI offered as an "alternate method of licensing": dual or split licensing. Under this approach, cable program services and cable system operators would have to obtain separate music performing rights licenses for the transmission of programming containing BMI music. (The system operator's license would also cover the system operator's non-program service programming.) In other words, a license would be required for both the transmission of the cable programming from the programmer to the system operator, and from the system operator to subscribers. The rationale for this splitting of fees was twofold: Primarily, BMI was attempting to capture a share of the greater earnings in the cable industry, that obtained by operators. E.g., Tr. at 2334–35, 2349. And, it was attempting to obtain compensation for

what it argues are the two separate public performances that occur in cable transmissions: from the cable programmer to the system operator, and from the system operator to the subscribing public. E.g., Whalen V.Tr. (J16) at 98–99.

BMI first introduced the approach in December 1989. It is undisputed that BMI actively sought to institute this new form of licensing and that it would prefer to license the cable industry in that manner thenceforth. E.g., P 178 at 4 (BMI President's Report, Apr. 2, 1990). As the Director of Legal Affairs of The Disney Channel recalled from a meeting with BMI in January 1990, BMI was adamant on this point and intended to obtain such licenses from all cable programmers. Whalen V.Tr. (J16) at 62–63.[23] HBO had a similar experience, as reflected in notes of a meeting between BMI attorneys and HBO, where the former intimated to the latter that BMI would not be giving through-to-the-viewer licenses. P 9L at 8. BMI also threatened to sue programmers for infringement unless they acceded to BMI's demands. E.g., P 4H (BMI letter to Arts & Entertainment Cable Network, Feb. 2, 1989); P 6E at 2 (BMI letter to CBN The Family Channel, Mar. 21, 1989).[24] At the same time, in early 1989, BMI proposed to the NCTA licensing committee a blanket license fee for system operators, at a fee of one percent of revenues, to cover their transmission of local originator and public access programming, as well as programming from unlicensed cable services. J.S. ¶ 84. NCTA refused.

BMI's Berenson testified that both this type of license, as well as a through-to-the-viewer license at a 1% rate, were sought from programmers. Tr. at 2334–35, 2472. Specifically, through-to-the-viewer licenses would be offered if they "encompassed the

---

22. E.g., P 3L–3N (July 1989 correspondence between BMI and BET attorneys); P 6D, 6E (March 1989 correspondence between BMI and CBN the Family Channel attorneys); P 4B, 4E, 4H–4L (January and February 1989 memoranda and correspondence concerning BMI licensing of Arts & Entertainment Cable Network).

23. Ms. Whalen testified that she interpreted the exchange with BMI to mean that "a through-to-

the-viewer license, it was not out of the realm of possibility but it was certainly out of the realm of the economically reasonable doable realm of possibility." Whalen V.Tr. (J16) at 107.

24. Citations to exhibits are illustrative rather than exhaustive; in most instances there are dozens of documents that could serve as examples.

entire revenue stream." *Id.* at 2469. BMI notes that it asked TDC, for example, to make a counterproposal, *id.* at 2472, but TDC never did so. *Id.;* Whalen V.Tr. (J16) at 107. BMI, for its part, refused to go to arbitration to settle these disputes. P 6E at 2.

In any event, the program services balked at these demands, refusing to pay above 0.25% of their revenue for a through-to-the-viewer license, Tr. at 2328–29, and rejecting the split licensing approach entirely. It was clear that BMI was seeking substantial increases in license fees, no matter the type of license. *E.g.,* Tr. at 2471. After the negotiations broke down, BMI sent letters to several program services indicating that unless license agreements were entered into, BMI would sue for infringement of their affiliates' copyrights for the programmers' unauthorized performance of BMI music.[25]

BMI subsequently instituted a number of copyright infringement actions against unlicensed program services. These included cases against Rainbow Programming, Lifetime Television, and the Christian Broadcasting Network.[26] In an antitrust case brought against it, BMI counterclaimed for infringement, as it has done here.[27] The most significant action BMI brought was against Home Box Office ("HBO") and Manhattan Cable Television, Inc. (*"HBO* case") in December 1989 after the failure of HBO to agree to the terms of renewing HBO's license on either a dual or through-to-the-viewer basis.[28] In that suit, BMI claimed copyright infringement and sought an injunction preventing HBO from continuing to transmit programming containing BMI music. The suit was settled a year later, well after the instant litigation began.[29]

BMI never sued BET, although it did send the programming service a "cease and desist letter" indicating that unless BET successfully negotiated a license, BMI would sue for infringement. P 3M; Tr. at 764. BET and other programmers did offer to have the appropriate fee determined by a neutral third party and to pay interim license fees while the final license terms were decided, but BMI was not interested. Tr. at 765, 767, 769, 2306; P 6E at 2. TDC's through-to-the-viewer license agreement with BMI expired on December 31, 1989. During negotiations for renewal in later 1989 and early 1990, BMI pushed for a split license arrangement, but did offer to consider a proposal for a through-to-the-viewer license, although at a substantially increased fee. On January 30, 1990, TDC and the other plaintiffs instituted this action.[30]

## II. THE ANTITRUST CLAIM

Section 1 of the Sherman Act forbids "[e]very contract, combination ... or conspiracy in restraint of trade or commerce." 15 U.S.C. § 1. Despite the literal wording, however, the statute prohibits only *unreasonable* restraints of trade. *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Thus, plaintiffs must show that a restraint exists; once such a showing is made, a "rule of reason" analysis is conducted to determine if the restraint is unreasonable

---

**25.** Isakoff V.Tr. (P 376A) at 49–51; P 6E; P 4H.

**26.** *See BMI v. Rainbow Programming Services Co.,* 88 Civ. 7158 (MGC) (S.D.N.Y. Oct. 7, 1988); *BMI v. Hearst/ABC Viacom Entertainment Services d/b/a Lifetime Television,* 89 Civ. 2833 (JFK) (S.D.N.Y. Apr. 25, 1989); *BMI v. The Christian Broadcasting Network,* 89 Civ. 6246 (JES) (S.D.N.Y. Sept. 21, 1989).

**27.** *See Arts & Entertainment Network v. BMI,* 89 Civ. 3526 (KMW) (S.D.N.Y. May 17, 1989).

**28.** *BMI v. Home Box Office,* 89 Civ. 8579 (JES) (S.D.N.Y. Dec. 28, 1989).

**29.** BMI and HBO agreed to a through-to-the-viewer license retroactive to February 1, 1990 through January 31, 1991. The agreed-upon fee was $0.15 per subscriber per year, amounting to approximately 0.3% of revenue), subject to adjustments should BMI be able to obtain a rate court modification to its consent decree. Manhattan Cable Television, Inc. remains unlicensed for its local origination programming and, of course, the transmission of programming from unlicensed cable program services. J.S. ¶ 76; D 899.

**30.** BET filed suit on February 7, and shortly thereafter the actions were consolidated.

and therefore unlawful.[31] This inquiry encompasses "all of the circumstances of the case," *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723, 108 S.Ct. 1515, 1519, 99 L.Ed.2d 808 (1988), and entails weighing the anticompetitive effects of the challenged practice against its procompetitive effects—its impact on competitive conditions. *National Society of Professional Engineers v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978); *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 49 n. 15, 97 S.Ct. 2549, 2557 n. 15, 53 L.Ed.2d 568 (1977). As expressed by Justice Brandeis in a frequently quoted passage,

> To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

*Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

Portraying the blanket license as a facial restraint on competition, plaintiffs urge the Court to apply a full rule of reason analysis to BMI's blanket licensing of music in syndicated programming and the dual licensing proposed by BMI in the negotiations that led to this lawsuit. Defendant, on the other hand, insists that the Court follow the shorter path traversed by the Second Circuit in both *CBS Remand* and *Buffalo Broadcasting* and ultimately end its journey at an earlier point, by determining that the blanket license constitutes no restraint at all. BMI is confident that the Court will find, as the Second Circuit did in those two contexts, that no restraint exists because there are "realistically available alterna-tives" to the blanket license. *See CBS Remand*, 620 F.2d at 936; *Buffalo Broadcasting*, 744 F.2d at 925, 933; *see also F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago*, 214 U.S.P.Q. 409, 415 (7th Cir.1982).

It is true that virtually any agreement or contract may restrain trade; "read literally, § 1 would outlaw the entire body of private contract law." *Professional Engineers*, 435 U.S. at 688, 98 S.Ct. at 1363. And while "trade is restrained ... where rights to use individual copyrights or patents may be obtained only by payment for a pool of such rights," *CBS Remand*, 620 F.2d at 935–36, here there is no explicit agreement or contract restraining the sale of music performing rights or otherwise prohibiting their sale outside of the blanket license. As explained *supra*, the music performing rights granted by the music's composers and publishers to BMI are nonexclusive. Composers and publishers explicitly retain the right to license users directly. Plaintiffs, moreover, do not allege any tacit conspiracy on the part of defendant or its affiliates to deny the granting of those rights by the affiliates to the cable industry. Rather, they assume that the existence of BMI (the pooling of these rights) by itself automatically constitutes a restraint.

Plaintiffs also imply that the Supreme Court virtually declared that the blanket license is a restraint. The opinion does not so hold. That was not the question before the Court; what it considered, and rejected, was the legal proposition that the blanket license was *per se* illegal under the antitrust laws. That conclusion might be read, in light of the remand to the Second Circuit to conduct a rule of reason analysis, to encompass a subsidiary finding that the blanket license was a restraint because it should be examined under that rubric. However, the opinion is vague on this point, its holding does not depend on such an assumption, and conclusions about im-

---

**31.** The rule of reason is applied where the restraint is not unlawful *per se*. The *per se* rule applies where "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."

*BMI v. CBS*, 441 U.S. at 19–20, 99 S.Ct. at 1562. In *BMI v. CBS* the Supreme Court ruled that the blanket license was not *per se* illegal and must be examined under the rule of reason.

plicit findings in Supreme Court opinions cannot be lightly reached. Indeed, were the Court to engage in delving for implication, there is language in the opinion suggesting that the blanket license is not a restraint. For example, the Supreme Court noted that "ASCAP is not really a joint sales agency offering the individual goods of many sellers, but is a separate seller offering its blanket license, of which the individual compositions are raw material." 441 U.S. at 22, 99 S.Ct. at 1564.[32] The Court further observed that "[t]he individual composers and authors have neither agreed not to sell individually in any other market nor use the blanket license to mask price fixing in other such markets," *id.* at 23–24, 99 S.Ct. at 1564, implying that their actions do not constitute a restraint on the music-licensing market.[33] Indeed, in a later gloss on its holding, the Supreme Court noted that "there was no limit of any kind placed on the volume that might be sold in the entire market and each individual remained free to sell his own music without restraint." *National Collegiate Athletic Association v. Board of Regents ("NCAA")*, 468 U.S. 85, 114, 104 S.Ct. 2948, 2967, 82 L.Ed.2d 70 (1984).

The cases plaintiffs rely on for their contention that a restraint exists (and that the Court should therefore immediately turn to a rule of reason inquiry) do not support their cause. In fact, the significant Supreme Court cases employing or expounding this doctrine arose out of agreements that were unmistakable restraints; the focus was on whether the particular restraints involved were lawful. In *Continental T.V.*, the Court concluded that a limit on the number of franchises granted for any given area and a requirement that each franchisee sell the respondent's products only from the locations at which he was franchised—vertical restrictions contained in franchise contracts—should be examined under the rule of reason. 433 U.S. at 59, 97 S.Ct. at 2562. In *Professional Engineers*, the Code of Ethics provision at issue affirmatively forbade competitive bidding for engineering services, thereby preventing engineers from soliciting and submitting price information to prospective clients until after the client had chosen an engineer. 435 U.S. at 683–84, 98 S.Ct. at 1361.[34] And in *NCAA*, the object of the Court's scrutiny was a college athletic association's plan for televising college football that constituted horizontal price fixing and an output limitation on its face. "There can be no doubt that the challenged practices of the NCAA constitute a restraint of trade in the sense that they limit members' freedom to negotiate and enter into their own contracts." 468 U.S. at 98, 104 S.Ct. at 2958–59; *see also id.* at 99, 104 S.Ct. at 2959. In *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990), a boycott by court-appointed lawyers—a facial prohibition on trade—was found to be a *per se* restraint. In *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the court considered whether horizontal agreements among doctors fixing maximum prices—a clear restraint—should be subject to the *per se* rule or a rule of reason inquiry. Indeed, the Supreme Court used the blanket license examined in *BMI v. CBS* as a means of distinguishing the practice challenged in *Maricopa County*. In contrast to the medical services there, "the 'blanket license' was entirely different from the

---

**32.** "[T]he blanket license is composed of the individual compositions plus the aggregating service. Here the whole is truly greater than the sum of its parts; it is, to some extent, a different product" from individual use licenses. 441 U.S. at 21–22, 99 S.Ct. at 1563.

**33.** It is interesting to observe that the sole dissenter, Justice Stevens, would have found the blanket license to fail the rule of reason test, but he reached that conclusion because, in his view, the license is a *monopolistic* restraint. 441 U.S.

at 38, 99 S.Ct. at 1571. Plaintiffs here nowhere asserted a monopoly claim against BMI; this case was brought under § 1 of the Sherman Act, not § 2.

**34.** "In this case we are presented with an agreement among competitors to refuse to discuss prices with potential customers until after negotiations have resulted in the initial selection of an engineer.... On its face, this agreement restrains trade within the meaning of § 1 of the Sherman Act." 435 U.S. at 692–93, 98 S.Ct. at 1365–66.

product that any one composer was able to sell by himself. Although there was little competition among individual composers for their separate compositions, the blanket-license arrangement did not place any restraint on the right of any individual copyright owner to sell his own compositions separately to any buyer at any price." 457 U.S. at 355, 102 S.Ct. at 2479 (footnotes omitted). That those cases invoked the rule of reason (or rejected it) has no bearing on the threshold question here, where there is no facial restraint.

■ This Court refuses to assume that a restraint exists and, accordingly, examines whether the blanket license is, in the first instance, a restraint at all. Plaintiffs claim that BMI's blanket license, by its very nature, is a *de facto* restraint of trade as applied to syndicated cable television programming with regard to both the programmers' transmission to cable operators and the cable operators' transmissions to subscribers. They highlight facts stipulated to or adduced at trial that purportedly lead to this conclusion: that BMI offers its repertory on an "all or nothing" basis, that the fees for the licenses do not reflect the quantity or quality of the compositions used, and that the fee "is not set by competition among individual copyright owners." *See BMI v. CBS*, 441 U.S. at 23, 99 S.Ct. at 1564. Plaintiffs also emphasize that all other rights pertaining to music use in syndicated programming are conveyed at the time of production and are done so in a competitive marketplace where negotiations as to these right are characterized by price competition. In other words, plaintiffs assert that in a world without the blanket license, music performing rights would be negotiated in the same competitive setting, via producer source licensing. In particular, the fact that syndicated programming, which the record establishes is critical to the commercial viability of both cable programmers and operators (especially from major studios),[35] involves music "in the can," and the agreements between programmers and the producers or distributors of syndicated programming prohibit the deletion of the music contained therein, restrains plaintiffs from obtaining performing rights by any means other than blanket licenses. Because BMI's practices leave them with no choice they violate the antitrust laws.

This superficially appealing argument does not survive a close scrutiny of the record evidence. Ironically, plaintiffs, in presenting the facts as proving their lack of choice, in essence are urging the Court to determine whether a choice exists. This brings the Court to the analysis plaintiffs claim is incorrect and should be bypassed, that employed by the Second Circuit in *CBS Remand* and especially *Buffalo Broadcasting*, where the Court emphasized that the important question was whether "there are no realistically available alternatives" to the blanket license. 744 F.2d at 933.

Although not binding on this Court, and although based on a significantly different trial record, the *Buffalo Broadcasting* decision is instructive and warrants brief review. That case, it may be recalled, was a challenge by local broadcast television stations to blanket licenses for music performing rights. According to the Second Circuit, the appropriate inquiry was "whether the plaintiff had proved that it lacked a realistic opportunity to obtain performance rights from individual copyright holders." *Id.* at 926. The trial court there had considered three alternatives—per program licenses, direct licenses, and source licenses—and had found each wanting. The Court of Appeals found the trial court's conclusions wrong as a matter of law. As to per program licenses, the court of appeals declared that transactions costs (*e.g.*, tracking down individual composers) and the burdens involved in monitoring had not been shown to be excessive in an objective sense. *Id.* at 926–27. As to direct licensing, the court found that plaintiff had failed to prove that it lacked sufficient market power to have the realistic opportunity

---

**35.** Rider V.Tr. (P 375A) at 12–14; Isakoff V.Tr. (P 376A) at 74, 90; Cooke V.Tr. (P 377A) at 11–12.

**628**

to secure such licenses, particularly because no evidence was offered that the local television stations had attempted to obtain such licenses and because they were able to obtain direct licenses for their own local programming. *Id.* at 929. Finally, as to source licensing, the court found that plaintiff had not proved the inability to obtain licenses from producers of syndicated programming who "could, if so inclined, convey music performing rights." *Id.* In this regard, the court observed that "notably absent from all of the correspondence" concerning offers by the local television stations to obtain music performing rights from producers "tendered by plaintiffs is the customary indicator of a buyer's seriousness in attempting to make a purchase—an offer of money." *Id.* at 930–31. The court thus concluded that plaintiffs had not presented "evidence that the blanket license is functioning to restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions at a reasonable price." *Id.* at 932.

Of course, the fact that local broadcast television stations did not prevail in their antitrust case challenge to the blanket license does not mean that plaintiffs here necessarily fail in their parallel quest. Antitrust questions are always fact-specific. The plaintiffs before this Court are different, especially because they represent two distinct sets of players in the market (programmers and system operators). The evidence presented at trial is not the same as that in *Buffalo Broadcasting.*[36] That being said, however, plaintiffs here have failed to carry their burden. It is clear from the record that there *are* realistic alternatives available—that plaintiffs, especially the cable programmers, do have a choice when it comes to obtaining music performing rights for the syndicated programming they transmit. These options are examined in turn below, first with regard to cable programmers, then with regard to cable system operators.

### A. Alternatives Available to Cable Program Services

#### 1. Source Licensing

Much of the time at trial was devoted to "supplier source licensing" or source licensing. In fact, this is the relief plaintiffs seek—to have music performing rights bargained for at the time producers select music for their syndicated product. They claim that suppliers of syndicated programming do not have the performing rights to convey, and that even if they do, the existing practice is not to pass on those rights because of the disincentive created by the blanket license.

#### a. Preexisting Music

Several form and actual synchronization licenses[37] governing rights to preexisting music issued to producers of motion pictures (a significant segment of syndicated programming acquired by cable services) were introduced into evidence that contain clauses limiting the music performing rights to U.S. theatrical exhibition. These licenses typically provide that television performance of the motion picture by anyone not licensed for such performing rights by ASCAP or BMI is subject to clearance of the performing right either from publisher or ASCAP or BMI or from any other licensor acting for or on behalf of publisher, and requires an additional license fee therefor. *See, e.g.,* P 39D ¶ 6 (Blackwood Music Inc. form). Similarly, a form pay/cable synchronization license used by the music publisher, the Goodman Group, for non-theatric release syndicated programs[38] states that it does not permit any use other than synchronization or recording, "it being understood that performing rights licenses must be secured from any

---

**36.** Plaintiffs argue that the one salient difference is that the Second Circuit relied on the existence of the ASCAP rate court to curb any potential abuses. The opinion does not turn on that fact. In any event, the remainder of the court's reasoning stands on its own.

**37.** Synchronization licenses issued to film and syndicated programming producers are usually based on the publisher's standard form. *E.g.,* Tr. at 1110; 1171.

**38.** These include made-for-television or -cable movies.

performing rights society or other entity having the legal right to issue such licenses as the owner of such rights." P 40II ¶ 3. It has clearly been the practice in the industry not to convey performance rights along with synchronization rights. Tr. at 391, 637–40; Rider V.Tr. (P 375A) at 35–36. Nonetheless, publishers do offer licenses for preexisting music that obligate the publisher to issue separate music performing rights licenses to cover unlicensed television exhibition. Tr. at 563–72; *see* D 667 ¶ 8(a), D 985 ¶ 2(b)(i). These contingent direct licenses, known as "back-up" licenses, commonly provide for a mandatory performance license to be granted to any television exhibitor unlicensed by BMI, the fee therefor to be negotiated between the producer and exhibitor (or by arbitration). For example, a synchronization and performance license for the composition "You Are My Sunshine," granted by the publisher to Walt Disney Studios, provides:

> With respect to the exhibition of said motion picture in the United States ... if any television exhibitor is not licensed to perform the musical composition by a blanket license issued by the performing rights society (if any) having the performing rights thereto ... Publisher shall, or shall cause said performing rights society to, license such television exhibitor ... for a reasonable performance fee to be negotiated ... or ... such fee shall be determined by a neutral arbitrator....

D 667 ¶ 8(a). An identical clause is present in a form used by Warner Brothers—one of the largest studios producing syndicated programming. *See* D 646 ¶ 9(a).[39] Indeed, synchronization licenses with these or similar clauses were recently entered into between the Disney Studio and the music publishing company EMI. Boris V.Tr. (D 1111A) at 45–46; *see* D 1109, D 1110. Form licenses containing contingent direct licensing clauses are also used by music

publishers, including Disney's Wonderland Music company. Tr. at 162. The second-largest music publisher in the world, Warner/Chapell, has used these forms since 1974. *See* D 14 ¶ 5(c).

Despite these contractual provisions to the contrary, plaintiffs rely on the existence of a "uniform expectation" that music performing rights will be licensed through BMI blanket licenses issued to cable programmers. Tr. at 366–67; 105; 1866–67. They also cite certain recent form agreements that explicitly require the licensee to obtain a separate music performing rights license, such as synchronization license forms for broadcast television used by ABKCO Music Inc., P 40A ¶ 3, and EMI Blackwood Music, Inc., P 40H ¶ 6. In any event, they argue that contingent direct licenses are the exception, rather than the rule.

Whatever the historic practice in the industry may have been, however, and whether it is a fact that only a minority of licenses for preexisting music provide for such rights, the evidence conclusively established that such licenses exist, in both standardized blank forms and in actual agreements.[40] Furthermore, there was no evidence provided that any cable entities had attempted to utilize the contingent direct license clause. Indeed, there was evidence that no cable television programmer had ever contacted Wonderland Music, a large music publisher, concerning the clause in their form licenses. Borgeson Dep. at 37–38.

The economic realities of the industry further belie plaintiffs' claims. It is stipulated that the negotiation of synchronization and theatric performing rights licenses for preexisting music in syndicated films and programs is characterized by price competition. J.S. ¶ 115. In determining license fees for the right to use preexisting

---

**39.** A Warner Brothers music attorney confirmed that these forms require the publisher to grant a direct license to the exhibitor if the exhibitor is not otherwise licensed. Margolis HBO Dep. at 48–49.

**40.** Plaintiffs' observation that these license provisions at most create an obligation in the publisher to grant a second license does nothing to advance their argument; that it is a second license does not impede their ability to obtain the music performing rights, nor does it render this option unrealistic.

music, the music publisher usually obtains from the producer information on the intended use of the music (e.g., theme or background). The resulting fee proposal is then subject to negotiation, and the producer in most instances can reject the offer if the fee is believed to be too high. Tr. at 1097–99, 1165–67. Producers, moreover, commonly solicit quotations for several different preexisting compositions from different publishers, so that the producer can select the composition after receiving proposed fee rates. Tr. at 1098–99; 1833–34.[41] Therefore, to survive in this competitive marketplace, publishers would grant contingent direct licenses to producers if they were demanded—even where current contracts do not allow for such licensing. Tr. at 1841.

Plaintiffs also point to the contractual arrangements between composers and their publishing companies as providing proof of the impediments that exist with regard to preexisting music in syndicated programming. These "songwriter agreements" govern the publisher's administration of the copyrighted compositions in the publisher's catalog, including the rights acquired by the publisher from the composer. These agreements vary both within a catalog and among publishers, but plaintiffs offered evidence of songwriter agreements with music publishing companies that prohibit the publisher from giving direct licensing without the composer's consent and that require composers' performing rights royalties to be licensed and received through BMI. *See* Tr. at 1863–65, 1908–10; P 45A ¶ 4(j); P 45J ¶ 5.01; P 45L ¶ 4(k); P 45HH ¶ 4(k). Plaintiffs did not show, how-

ever, that composers would not give their permission for such licenses. Further, these contractual provisions are not necessarily immutable. For example, songwriter Richard Sherman testified that, if pressed, he would grant his performing rights to the producer. Tr. at 2014. As with the other contract language discussed in this case, this language is amenable to change in response to market forces such as demand and in response to the right price.

### b. Original Music

Plaintiffs also sought to prove that producers of programming containing "original music" (music specifically created for that programming) were unable to obtain the performance rights from the composer and publisher, and thus are precluded from granting licenses for performing rights even if requested to do so. The majority of music in syndicated programming is original music. Rights to original music are generally governed in the industry by "work-for-hire" agreements. These are producer-generated standard form contracts, in which the only term that is negotiated is the price. Tr. at 319–20, 1743–44, 1943–47. Pursuant to these contracts, the composer usually receives an initial ("upfront") fee and, sometimes, agrees to a further compensation formula that would permit him or her to retain the right to receive royalties from public performance of the work and for any market sales of the music that may occur.[42]

The parties stipulated that work-for-hire agreements typically transfer from the composer to the producer "nearly all

---

**41.** Plaintiffs made much of the few instances where a producer has no choice as to the preexisting music that will be used in the syndicated programming or theatrical film, as for example when a producer neglects to get a synchronization license before synchronizing the music into the soundtrack. *See* Tr. at 360–62; *see also* Boris V.Tr. (D 1111A) at 65–71; P 39F–39G; P 39BB. These exceptional situations, however, do not prove the blanket license to be a restraint, or even that BMI can extract supracompetitive license fees. The fees for performing rights are unquestionably higher in these circumstances; but even plaintiffs admit they are not extortionate, as BMI or other licensing enti-

ties will not make the price so high as to "kill" the deal.

**42.** Obviously, the fees and compensation formulas commanded by composers vary tremendously, depending on, *inter alia* the composers' reputation, past successes, the nature of the music and the project involved. Thus, the composer J. Williams and his music publisher (MCA) received $200,000 for the score to the film "Always" (P 29H ¶ 3(a)), while composer F. Merlin and his publisher Metromedia Productions received $5,000 for the score of the television movie "Lady of the House." (P 38M ¶ 6).

rights" to the original music. Plaintiffs introduced evidence showing that these agreements often do not grant the producer the right to perform or to authorize others to perform the music nontheatrically, without the producer obtaining express consent or an additional license from the composer. They then attempt to transform this evidence into the factual conclusion that music performing rights are not included in such agreements. Such a determination, however, would require viewing the evidence through an opaque screen.

Plaintiffs largely rely on the standard work-for-hire agreements formulated before or during the early the 1980s. These form agreements contain language identical or substantially similar to the following excerpt:

> [T]o assure the Artist of participation in the revenue which may be derived from performances of the Compositions ... Producer will, and it does hereby, transfer and assign the world-wide Performing Rights ... in and to the Compositions to the Artist and a publisher of the Producer's choice....

P 35E, Exh. A ¶ 3 (1987 agreement between Patrick Williams and Twentieth Century Fox); *see also* P 33F, Sched. B ¶ 3 (1980); P 33A, Sched. A ¶ 3 (1990); P 35 A, Exh. A ¶ 3 (1982). These clauses result in the composer receiving compensation for nontheatric public performances of the music only from BMI (or ASCAP or SESAC). Further, composers testified that they understood these types of contracts to mean that producers would not or could not assign music performing rights to any third party. Tr. at 1792–94; 1982–83; 2012–13.

Yet other (and generally more recent) [43] work-for-hire standard forms do provide for the transfer from the composer to the producers of *all* rights to the original music. One example of such forms provides as follows:

> Notwithstanding any provisions to the contrary contained herein, if at any time

any television network, television station or other company ('Television Entity') ... does not or may not hold a non-dramatic performing license from ASCAP, BMI ... or if a Television Entity so require, [Producer] shall automatically have the exclusive right to license to each such Television Entity the non-dramatic performing rights in and to the Music for use in connection with the Show.

D 243 § 3 (standard Disney Studio form). *See also* D 404 (Warner Bros); D 314 (Universal); D 205 (MGM); D 651 (Twentieth Century Fox); P 37A Exh. B ¶ 1(d)(i) (1990 agreement between Michael Kamen and Pathe Entertainment, Inc.); P 30A ¶ 9(b)(vii) (standard United Artists motion picture form); P 34G ¶ 8(b)(vii).[44] Similar to the above-quoted "automatic performance rights license" is the "grant of rights" clause, such as that in a form used by the Paramount Picture Corporation for composer-for-hire agreements:

> [I]t is specifically understood and agreed that included in the ownership of all rights of [Paramount] in and to the Compositions is the specific and irrevocable right under any and all circumstances, in perpetuity, to perform publicly for profit, or otherwise, and to authorize others to do so....

P 33A Sched. A ¶ 2; *see also, e.g.,* P 32F ¶ 4 (1989 agreement); D 783 ¶ 8(c)(vii) (Pathe Entertainment, Inc. form); D 990 Exh. A ¶ 4 (Orion form).

Again, plaintiffs rely on the historic, prevailing practice in the industry and on what they claim has been the specific, uniform intent in virtually all these instances that compensation for music performing rights on cable television will be determined and distributed by BMI (or ASCAP or SESAC, as the case may be). Great significance is attached to the fact that current forms do not render music performing rights the subject of negotiation—they are subsumed into negotiations over the whole package. Plaintiffs also attempted, through their in-

---

**43.** It would appear that the clauses currently used most often arose after the litigation in *Buffalo Broadcasting* began.

**44.** There was testimony that producers attempt to include these automatic license provisions even where the forms do not provide for them. Margolis HBO Dep. at 52.

dustry expert, to dismiss the clauses as giving merely "technical" rights. Tr. at 549, 561.[45] Yet a witness for plaintiffs from TDC admitted that it could obtain such rights from the Disney Studio. Tr. at 157–58. Plaintiffs also argued that these clauses are meaningless because the contracts still provide for compensation for public performance rights to be received in the first instance through the performing rights society. But nothing is proven by the observation that these are merely back-up provisions.

Plaintiffs' assertions that there are no known instances of producers authorizing unlicensed exhibitors to perform music under one of these provisions, and that BMI composers are "generally unaware" of the existence of these clauses, carry little weight. For no evidence was offered that any cable entity ever attempted to obtain such rights through that mechanism. *See* Borgeson Dep. at 41–42; Breen Dep. at 57–58.

Economic realities of this segment of the music market are that there is, as the parties stipulated, intense competition among composers to be hired to write original music for such programming. Thus, producers are able to select, on the basis of quality and price, from among numerous composers to create music for their motion pictures or other syndicated programming. But plaintiffs dismiss this competition as not entirely relevant because, they claim, there is no price competition among composers regarding the licensing of cable television performing rights to that music. *See Buffalo Broadcasting,* 744 F.2d at 932. Again, that observation deserves little weight where there has been no opportunity for such competition to arise because it has not been pursued by the cable industry.

Finally, very few cable programmers ever attempted to obtain source licensing for syndicated programming. The Senior Vice President for Programming at TDC testified that TDC had never asked suppliers of programming to obtain performing rights. Rider V.Tr. (P 375A) at 37; *see also* Tr. at 136–37. Those that did—BET, HBO and The Family Channel—did not offer any additional money to obtain the performance rights. Tr. at 731–32; Isakoff V.Tr. (P 376A) at 73–74. A fact further undermining their position is that, notwithstanding their failure to offer additional compensation, source licensing was obtained in several instances. The Family Channel obtained source licensing clauses in a number of syndicated programming contracts acquired from 1987 through 1990. Isakoff V.Tr. (P 376A) at 63–64; *see* D 286, D 299, D 376, D 379, D 385. HBO has obtained source licensing clauses in approximately 300 agreements concerning syndicated programming since 1984. Cooke V.Tr. (P 377A) at 13–15. Plaintiffs therefore can show no restraint created by blanket licensing impeding that alternative with regard to licensing that type of music in syndicated programming.

## 2. Direct Licensing

With regard to direct licensing, it bears repeating that the blanket license is a *non-exclusive* arrangement. In other words, plaintiffs could choose to obtain licenses directly from the composers and publishers of the musical works contained in syndicated programming. Therefore, the question is not whether "direct licensing" is an option, but whether it is realistically available. There are hundreds of individual compositions that would have to be cleared with each individual copyright proprietor. And there was testimony to the effect that ascertaining the identity of and then reaching the appropriate copyright proprietors was difficult and costly. Tr. at 439–40; 688–89; 1078–79; Isakoff V.Tr. (P 376A) at 43–44. But even were that feasible, it was clear that for syndicated programming, although the programs are obviously selected and known, the musical content is not specified.[46] Attempts by Home Box Office

---

**45.** He stated that "there is a tacit understanding in the industry that this clause is a nonstarter and is there for window dressing only." Tr. at 550.

**46.** Tr. at 437–38; 682, 686–88; 753–57.

to obtain direct licensing for all its programming were only partially successful.[47]

Plaintiffs insist that so long as the blanket license exists, direct licensing will not be economically feasible because copyright proprietors will want at least as much remuneration as they would obtain from distributions they receive through the blanket licensing system. HBO's strategy for obtaining direct licenses began with ascertaining what BMI had been paying the copyright proprietors. Clark HBO Dep. at 556–62. Those publishers who were willing to negotiate with HBO demanded at a minimum the same amount as their BMI distributions, and at times, much more. In other words, the blanket license serves as a pricing floor. Tr. at 1844; Boris V.Tr. (D 1111A) at 103–09; P 47T, P 47U, P AA–P DD (HBO–EMI correspondence); P 47FF–P 47II (Famous Music–BMI–HBO correspondence).

BMI points out that the sheer magnitude of the task does not make it impossible, if for no other reason than the fact that its licensing agreements with publishers (as well as composers) are nonexclusive. Furthermore, they emphasize the stipulated fact that few cable program services have attempted to obtain direct licenses for the music in their syndicated programming; in particular, neither plaintiff programming service here (TDC and BET) made any efforts in that direction. J.S. ¶ 126.[48] The Court agrees that the dearth of any evidence in this regard renders plaintiffs' contentions largely speculative.

As for HBO's efforts, they too do not form a sound basis for any conclusions as to the feasibility of direct licensing. HBO did not begin its direct licensing campaign until after BMI had filed the infringement suit against it, which calls into question the results obtained.[49] Some testimony indicated that publishers found HBO's offers to be deficient, both in the amount of money offered, Pinkus HBO Dep. at 53–54, and in the specific information conveyed, such as the number of potential exhibitors, that would enable a price to be determined. Ryan HBO Dep. at 85.

Publishers, moreover, have issued such licenses when asked. J.S. ¶¶ 95, 132. Four publishers testified that they would grant direct licenses, for the right price. Tr. at 1184; 1844; 1901–03; Boris V.Tr. (D 1111A) at 14–16. For example, the music publisher EMI will give quotes for performing rights when approached for synchronization rights by unlicensed entities. D 840 (EMI–NBC direct license, 1990); D 843 (EMI letter to ASCAP concerning ESPN direct license); D 857 (Colgems EMI–ESPN direct license, 1990).[50]

Finally, the laws of supply and demand would dictate that direct licenses would be granted if they were demanded. *See* Tr. at 2106–07. The lack of a mechanism or mechanisms for dealing with the negotiations and monitoring of such rights is not necessarily an impediment, either. Defendant's economic expert testified persuasively that the required intermediaries would arise. Tr. at 2124. The fact that the market for synchronization rights is brokered largely by one institution (the Harry Fox

**47.** Isakoff V.Tr. (P 376A) at 37–44; Clark HBO Tr. 567–68 (HBO sought to license hundreds of programs but only succeeded with nine); Segal HBO Tr. at 630 (same). HBO officials involved sensed that BMI was attempting to hamper their efforts. Segal HBO Tr. at 658–59. But they also understood that the difficulty partly stemmed from the fact that direct licensing was a new and unfamiliar approach. Clark HBO Tr. at 550–55.

**48.** TDC is affiliated with six music publishers, including two large entities, Wonderland Music and Walt Disney Music. Yet TDC failed to investigate the possibility of obtaining direct li-

censing through these companies, even though such licenses could have been granted. Tr. at 162–63; 1184.

**49.** *Cf. Buffalo Broadcasting,* 744 F.2d at 931 (attempts to obtain licenses other than blanket licenses were "darkened by the shadow of the approaching trial" and therefore the results were not dispositive either way).

**50.** EMI has also offered a "mini blanket license," a bulk license covering all the compositions in its catalog. Boris V.Tr. (D 1111A) at 38–39; *see also* Tr. at 1936.

Agency) bolsters this contention.[51] *See* J.S. ¶ 94.

Accordingly, the Court concludes that, although clearly neither the easiest nor most convenient method, direct licenses for music in syndicated programming is a realistically available alternative to the blanket license for cable program services.

### 3. Per Program Licenses

Another alternative offered as evidence of the lack of restraint is the "per-program" license. Such a license is a modified form of a blanket license, providing unlimited access to the entire BMI repertory for a fee based only on programs using BMI music. Plaintiffs label this option the "disappearing alternative." Although not as accessible as source licensing, it too, the Court concludes, exists as a realistic alternative.

Plaintiffs argue that the practical unavailability of per program licenses is apparent from BMI insistence that it is not required under its consent decree to offer such licenses to cable services and operators. Apart from the shaky legal ground for BMI's position on this issue,[52] the fact is that BMI has offered such licenses to every cable programmer that asked for one. *E.g.*, Tr. at 818–19; 2285, 2369–70; D 573 (offer to the Family Channel); D 575 (offer to Lifetime cable network).[53]

Even so, plaintiffs insist that it is not a realistic option because BMI's offers for per-program licenses were at a rate of 4.5% of revenue multiplied by the fraction of the services' schedule containing BMI-repertory music—in other words, four and a

half times the offered blanket license rate. Representatives of cable services testified that such a rate was so costly as to render it a meaningless alternative, *e.g.*, Tr. at 829–30, or so costly that they believed it was not a serious offer. *Id.* at 761 Whalen V.Tr. (J16) at 65–67. Plaintiffs' reliance on this evidence is misplaced.

As with their approach to other kinds of licensing, plaintiffs failed to show that they made any serious efforts to obtain per program licenses. Indeed, there was an absence of evidence that cable services to whom BMI offered per program licenses ever considered that option. None ever counterproposed; certainly neither BET nor TDC indicated that they were willing to contemplate this type of licensing. Tr. at 760–61; Whalen V.Tr. (J16) at 97–98. This failure to engage in negotiation—the robust and focused give-and-take of the competitive marketplace—cannot shore up their claims of unavailability. As the Supreme Court observed, a complaint that an offeror's fee demand "is so high as to preclude agreement fails to acknowledge that an initially high asking price does not preclude bargaining." *Stewart v. Abend*, 495 U.S. 207, 110 S.Ct. 1750, 1764, 109 L.Ed.2d 184 (1990). It cannot be said that a quoted price is too high when it cannot be ascertained what the actual price would have been had any bargaining occurred or, better, an agreement reached.[54]

In sum, cable program services do have realistically available alternatives to the BMI blanket license and, therefore, the latter does not constitute a restraint of trade within the meaning of § 1 of the Sherman

---

**51.** *Cf. Buffalo Broadcasting*, 744 F.2d 929 (plaintiffs failed to show that intermediaries would not arise if direct licensing were demanded).

**52.** Magistrate Judge Dolinger recently determined in an ASCAP rate court proceeding that ASCAP's consent decree requires it to offer per program licenses to cable program services. *United States v. ASCAP (In the Matter of the Application of Turner Broadcasting System, Inc., et al.)*, Civ. 13–95 (WCC) (S.D.N.Y. July 11, 1991), Memorandum and Order. *See infra* for the resolution of the question in this case.

**53.** Indeed, the per program license would aid in attempts to change from the blanket license to a

different license regime because it would serve as an interim licensing mechanism while other avenues were pursued. Tr. at 1430–31, 1442–43. *Cf. Buffalo Broadcasting*, 744 F.2d at 928.

**54.** Further, as with the discussion of price competition *infra*, there was also no evidence of the relationship between the price asked and the value of the license received. *Cf. Buffalo Broadcasting*, 744 F.2d at 926 (multiples of blanket license fee not a valid test of cost because no evidence indicated that price was high in relation to the value received).

Act.[55]

## B. Alternatives Available to Cable System Operators

Many of the arguments plaintiffs advanced with respect to the licensing alternatives available to cable program services were also raised with respect to cable system operators, albeit with more force, because operators are, simply put, in a different position. They are further down the line in the set of transactions and transmissions that bring cable programs to the public. System operators, unlike program services, do not participate in the selection of or negotiation over syndicated programming. They have no relationship with producers or syndicators. Further, they transmit up to several dozen different cable program services, each with up to hundreds of syndicated programs containing BMI music—amounting in some cases to tens of thousands of compositions every month. *See, e.g.*, Tr. at 439–40.

It is not only their distance from syndicated program production and the magnitude of the programming they carry that distinguishes cable operators in this context; it is also their contractual relationships with the cable programmers whose programming they transmit. Cable system operators are contractually bound to transmit cable services' programming simultaneously on receipt from the satellite, and without interruption or editing. *E.g.*, P 53C ¶ 6(b); P 54G ¶ 4(c). Moreover, they have little advance notice (from a month or two to ten days or less) of the programming content, much less the music therein. *See* Tr. at 422, 437–38; 682, 686–88; Whalen V.Tr. (J16) at 19–23; Rider V.Tr. (P375A) at 40–41, 81. Also, they may not refuse to carry programming because they have not obtained music performing rights from the programmer. Clearly, these circumstances render direct licensing of cable operators cumbersome and, the Court finds, unrealistic.

Source licensing, at first blush, also would not appear to be ultimately possible, as the market now exists, because system operators simply do not interact with program producers or syndicators. However, it was demonstrated that source licensing *is* available to cable system operators in the sense that they could obtain clearance for these rights from *their* sources, the cable programming services. Plaintiffs argued that the representations and warranties in affiliation agreements concerning music performing rights are not equivalent to source licensing unless the cable network has the authority to convey the rights. But that merely begs the question of this litigation, one that has been answered affirmatively—whether the cable programmers can indeed obtain licensing from their sources.

Defendants also attacked the portrayal of system operators as helpless victims in the music performing rights market. Many system operators are vertically integrated with programming services and, in any event, most are parts of "MSOs"—they are multiple-system operators. The trial testimony of two MSO executives, Robert Miron and Julian Brodsky, revealed that MSOs are indeed vertically integrated in that they own interests in various cable programming services. *E.g.*, Tr. at 462–63. The top fifty MSOs account for more than 90% of the nation's cable television subscribers. D 852 (FCC Report No. 90–276, July 31, 1990) at 5106. The stipulated facts illustrate the complex ownership relations among these various components of the cable industry. For example, Time Warner Inc. has a subsidiary, the MSO American Television and Communications Corporation, which owns the HBO and Cinemax Cable program services. HBO, in turn, owns an interest in BET. Time Warner Inc. also owns programming producers

---

**55.** Another alternative that BMI contends is realistically available is the elimination of BMI music from programming altogether. It cites the example of an agreement between The Family Channel and certain of its producers in Canada that only ASCAP music would be used. Isakoff V.Tr. (P 376A) at 86–89. This option is patently unrealistic in view of the quantity of programming carried. In any event, further consideration of it is unwarranted in light of the availability of other means.

such as Warner Bros., Inc. and Lorimar Television, and also owns several music publishers, including Warner/Chapell Music and Warner–Tamerlane Publishing Co. and Lorimar Music Bee Corp.—the last two being affiliates of BMI. J.S. ¶¶ 31, 33. Thus, in addition to their economic ties with programmers, MSOs often own music publishers and production companies. J.S. ¶ 32.

However, even if the cable operators owned by these MSOs would be able to obtain music performing rights with relative ease, or indemnification or warranties therefor, from their affiliated programming services,[56] that does not establish that all system operators would have this opportunity realistically available to them.[57] In other words, those cable system operators without such affiliations do not benefit from this potential advantage. More significantly, the economic concentration of the most powerful MSOs does not give them special access to the programming services with which they are not affiliated—in most cases, the majority of the programming services they carry. *See* Tr. at 403–10; 1059.

However, all that being said, it is also indisputable that cable system operators are themselves monopsonies—with perhaps half a dozen exceptions, cable system operators are the only purchasers and, more importantly, the only transmitters of programming in their geographic areas. (Most cable systems obtain exclusive franchises from municipalities or other local governments to transmit cable television in their territories. J.S. ¶ 29.) Were cable operators faced with the prospect, they would attempt to obtain licensing through an intermediary—most likely, the program-

mers whose fare they carry, *see* Tr. at 2124, and, given that they are usually the sole conduits for the cable programming system in a given area, and in consideration of their aggregated power, it is entirely plausible that programmers would accommodate them. *E.g.*, Hirsch HBO Tr. at 315–16.[58]

While direct licensing is not a realistic option, and while it is a closer question than with regard to programming services, it is nonetheless clear that source licensing is realistically available to cable system operators. The blanket license does not, therefore, represent a restraint of trade with regard to cable system operators.

### C. Other Alleged Constraints

■ Even if the above-described alternatives do exist, plaintiffs insist they are ultimately illusory because, as a practical matter, the existence of the blanket license and the industry practices that have grown up around it, serve as insurmountable obstacles to obtaining performing rights licenses through other avenues. It is recognized that program producers customarily do not discuss with BMI publishers the acquisition of the right to perform the preexisting music on cable entities. These obstacles, which plaintiffs claim bar competitive trade (as to source licensing in particular), can be grouped into three broad categories: (1) the disincentives created by the existence of the blanket license; (2) the lopsided bargaining power of BMI, particularly concerning negotiations over syndicated programming because the music therein is "in the can;" and (3) the beneficial economic relationship between producers and publishing companies.

---

**56.** Plaintiffs' evidence that such arrangements do not now occur does not carry much weight, for the same reasons that their claims that the current practice of source licensing does not occur—they failed to establish that it could not be accomplished with relative ease. Indeed, contrary to plaintiffs' view, the fact that some cable networks have signed affiliation contracts with MSOs warranting music performing rights *does* demonstrate that this form of source licensing is available to system operators, not just that the programming service has assumed the risk of those rights.

**57.** Defendant's economic expert testified that because the MSOs are integrated with programmers, it follows that they have the same access to licensing options as programmers. Tr. at 2123–25.

**58.** One MSO executive did testify that he believes cable programmers have the upper hand: "the leverage is all on their side at this point." Tr. at 434.

### 1. Existence of the Blanket License

The existence of the blanket license, plaintiffs assert, creates a series of disincentives that discourage source licensing. They contend that the major distributors of syndicated product are all aware that music performing rights are treated differently from other rights, and know that because cable networks will not be able to secure source licensing from other syndicators, there is no risk of losing cable customers to other competitors if they do not offer such licenses. Thus, plaintiffs give no weight to the stipulated fact that there is competition among syndicators to sell programming, and defendant's expert's testimony to that effect. In other words, it is argued that the lack of a genuine risk of losing a sale of programming over music performing rights arrangements proves that source licensing is not a "realistic alternative" to the blanket license. This proffer suffers from the same deficiencies that weakened plaintiffs' claims about the availability of alternatives: without showing that any cable programmer ever asked a producer to include music performing rights in a license, their proof is only speculative. Further, it ignores the characteristics of supply and demand. It may be that the general competitive nature of the industry does not reflect intense competition as to this particular right, but as defendant's economic expert convincingly testified, if cable performing rights were demanded, the syndication market would provide them to avoid the risk of losing sales. Tr. at 2112–13.

### 2. Bargaining Power and "Music in the Can"

It is undisputed that cable networks compete with each other, with broadcast television networks, and others for the rights to carry desirable syndicated programming. It is also evident that cable programmers such as TDC and BET must obtain desirable syndicated programming to compete in their market. Bruce Rider, Senior Vice President of Programming for TDC, testified that TDC always competed with others for programming and that it is a "seller's market." Rider V.Tr. (P 375A) at 24; *see also* Tr. at 830. Thus, plaintiffs claims, distributors will decline to license programs to cable program services if the requested terms are inconvenient, such as a demand for music performing rights. Accordingly, to stay competitive, the argument continues, plaintiffs have no choice but to stay within the *status quo*—take the blanket license.

More persuasive to common sense, however, is the fact that music in syndicated programming is "in the can" and thus cable entities have no bargaining power with regard to the performing rights. Cable networks and operators do not select or negotiate for music contained in the programs; that transaction occurs at the point of production. Further, licensees of syndicated programming generally cannot edit, delete, or otherwise alter the content of the programming they obtain from syndicators without their express permission.[59] In order to transmit syndicated programming, cable networks (and system operators) have no choice but to transmit whatever music is in the syndicated programming they have obtained. Music performing rights proprietors (whether the composer and publisher for direct licensing, or the producer for source licensing), then, can extract a higher price than might otherwise be warranted because once the acquirer of the programming has obtained the programming (including all rights but music performing rights), the acquirer is forced to take it or leave it, and once the programming is purchased, the acquirer must pay whatever price is asked in order to transmit.

BMI blames plaintiffs for their apparent quandary because they could have sought source licensing for music performing rights, but did not. "A programmer choosing to rely on the expected future availability of the blanket license when buying programming, instead of seeking source li-

---

**59.** However, contracts with syndicators or other suppliers do allow programming services to edit programs for "standards and practices," *i.e.*, to screen out obscene language, in particular. Rider V.Tr. (P 375A) at 25–30.

censes at that time, cannot now be heard to attack the blanket license." Defendant's Post-trial Memorandum of Law at 48.

Second, the programmers' market position in relation to producers and syndicators is not as lopsided as plaintiffs suggest. Cable programmers have substantial market power vis-a-vis producers as the buyers of their programming. The motion picture production and sales industry is highly competitive, J.S. ¶ 101, and their sales to cable programmers generate substantial revenues for producers. Tr. at 594, 597; Cooke V.Tr. (P 377A) at 34–35, 41–43; Isakoff V.Tr. (P 376A) at 70. It is reasonable to conclude that, given the importance of cable to programming producers, producers would change their practices and provide source licensing if this important segment of their purchasers seriously demanded it.

As to the hold-up situation, defendant proffered testimony from music publishers that they do not exert their apparently superior bargaining power when approached by an unlicensed programmer who has already purchased programming containing their music. BMI analogized the situation to negotiations of synchronization rights license for music already "in the can," such as where a producer's five-year synchronization rights expire and the programming involved continues to be distributed. Polygram Island Music Group's Vice–President of Business Affairs Jeffrey Brabec testified that the need to maintain good relations with producers will check any abuse of his bargaining power in that situation.[60] Similar testimony was offered by Helene Blue, the managing director of the music publisher the Goodman Group, concerning a synchronization license fee accepted by BET for the music performing rights to the music in episodes of the syndicated series "Frank's Place." The license agreed to by BET was only slightly higher than the original (expired) license. Tr. at 1887–93; *compare* D 1101 *with* D 1103. The publisher's testimony is buttressed by

the fact that publishers work in a highly competitive market, J.S. ¶ 91, and would not want to engage in any negotiating that would be perceived as coercive because the resulting ill-will would spill over to their other transactions in the business. Tr. at 1841. Also important in this regard is that publishers desire and are mandated to obtain as much exposure for the compositions in their catalogs as possible. *See* J.S. ¶¶ 92, 93.

Finally, it bears noting that the Second Circuit rejected this same argument when the television network CBS argued that direct licensing was impeded by such bargaining power. CBS had claimed that "it would be subject to demands for unconscionably high fees from the owners of copyrighted music already recorded on the soundtracks of taped programs and feature film in CBS's inventory." *CBS Remand,* 620 F.2d at 938. As in this case, however, the trial record revealed that synchronization rights were regularly obtained at reasonable prices after the fact, and that copyright proprietors were not willing to risk their good will in the industry by engaging in "hold ups." In addition to the factual deficit in CBS' claim—the same deficit as here—the Second Circuit also observed that as a legal matter the alleged imbalance of bargaining power was not the result of the blanket license.

> If CBS would be vulnerable to a 'hold-up' when it tries to acquire performance rights for music on a feature film it wishes to rerun, that is a consequence of CBS's failure to acquire rerun performance rights at the time it acquired the film. At that time CBS accepted the risk that it would one day have to purchase performance rights for reruns, either as part of the purchase price for a blanket license or at a separate price for a license obtained directly from the copyright owner.

*Id.* Those considerations are equally appropriate with regard to the cable indus-

---

**60.** Mr. Brabec stated, "I might feel like I've got an awful lot of bargaining power, because my song is in the film—or in the TV series. But if I try to really abuse whatever bargaining power I think I might have in this one particular situa-tion, I guarantee you that producer is going to remember me and my company, and we are going to be avoided in the future. So I have got to stay within somewhat reasonable [price] ranges." Tr. at 1852.

try's challenge in this lawsuit. Especially in light of the fact that the cable programmers could obtain source licenses if they so desired, the perceived inequity is of their own making. And direct licenses are indeed feasible in this context, where the programmer does choose the programming, and has hundreds, if not more, options from which to choose.

Plaintiffs also tried to show that in general terms, BMI has inflated market power because of its monopoly position with regard to the pooled rights in its repertory. They proffered the testimony of cable programming executives to the effect that BMI extracts prices not based on the value of the rights conveyed, but based on a determination by the licensee programmers of their ability to pay and their willingness to do so in circumstances where they perceive they have no practical alternative. Tr. at 110–13. They point to BMI's concession that it did not consider the cable network's ability to take advantage of alternatives when formulating the fees proposed in late 1989 and early 1990 (1% of revenues, split licensing). In other words, plaintiffs assert that defendant itself believed it had the ability to extract a monopolistic price, or at least a price substantially greater than had been demanded previously. *See* Preston HBO Dep. at 154–55 (BMI never considered possibility of direct license to be a constraint); Preston Dep. at 70–72 (BMI does not feel constrained by ASCAP's fees); Tr. at 2471. What the parties perceived may be relevant in determining what a reasonable license fee would be, *see AS-CAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 572, 585–86 (S.D.N.Y.1989), *aff'd*, 912 F.2d 563, 570–71 (2d Cir.1990) ("*Showtime* "),[61] but this Court does not sit as a rate court, this Court must decide an antitrust case on the record evidence. What matters is objective availability, objective price, objective market power.

Another aspect of market power that is relevant to the Court's examination is the market power of the purchaser, not just the seller. For the seller to have undue market power requires its converse—that the purchasers have little market power. The evidence showed that plaintiffs cannot claim to have little market power in relation to BMI. First, of course, the Court has already determined that plaintiffs do indeed have a choice of licensing options, which means that they can exert power in the marketplace by refusing unfavorable terms offered by BMI. Second, even assuming that plaintiffs have little or no choice, and that they are constrained by the current structure of the market and current practices in the industry (a position already rejected), plaintiffs themselves have considerable economic power in this marketplace. Cable program services as a group represent a large force in the entertainment industry and a source of enormous potential revenue for BMI. As the industry matured in the 1980s, particularly after deregulation in 1984,[62] the number of cable program services and, more importantly, the number of subscribers thereto, rose substantially—as did revenues. *E.g.*, U.S. General Accounting Office, Telecommunications: Follow–Up National Survey of Cable Television Rates and Services (Report to the Chairman, Subcommittee on Telecommunications and Finance, Committee on Energy and Commerce, House of Representatives GAO/RCED–90–199, June 13, 1990, at 25, 56–61 (D 596); Tr. at 472–73; D 1038 attachment (Newhouse Broadcasting Corporation's subscriber and advertising revenues from 1983 to 1989). At present, there are approximately 80 such services (15 pay, 65 basic), J.S. ¶ 36, serving over 80 million subscribers. *See* O.S. As mentioned earlier, an examination of the Ownership Stipulation reveals an intricate web of ownership relationships among cable companies; indeed, ownership is concentrated and overlapping. To cite but one example, the pay programmers HBO and Cinemax together account for over 23 million subscribers; both are owned by Time Warner Inc., which also has ownership interests in, *inter alia*, BET and the Turner Broadcasting System. Finally, cable pro-

---

**61.** The Magistrate Judge's opinion is printed as an appendix to the Second Circuit's opinion.

**62.** *See* 47 U.S.C. §§ 521 *et seq.* (Cable Communications Policy Act of 1984).

grammers have a national trade association, the NCTA.

That much and more is true for cable system operators. With only a few exceptions, Tr. at 453–55, operators are granted exclusive franchises to deliver cable television to certain territories. J.S. ¶ 29. And, the vast majority of cable operators belong to MSOs. Finally, on a national level, they are specifically represented by the NCTA Music Licensing Committee, the purpose of which is to address licensing issues of concern to the system operator members of NCTA as well as CATA. J.S. ¶¶ 2, 3.[63]

These facts present a very different scenario than that in *Broadcast Music, Inc. v. Moor–Law, Inc.*, 527 F.Supp. 758 (D.Del. 1981), *aff'd mem.*, 691 F.2d 490 (3d Cir. 1982), where the district court found that the plaintiffs there (small establishments such as bars that provide live music), were overwhelmed by the market power of BMI: "where there is no corresponding power on the buyer's side. Unlike the television network market where buyers like CBS can exercise some monopsony power of their own, the buyers [here] are weak and diffuse." 527 F.Supp. at 764. Interestingly, the ASCAP rate court concluded in *Showtime* that cable companies did not have substantial bargaining leverage in the market as compared to ASCAP, especially in contrast to national broadcast networks (*CBS Remand*) and local broadcast television stations (*Buffalo Broadcasting*). "CBS is, of course, one of a small handful of national networks, with the advantage of a very high public profile, substantially greater revenues than the individual cable companies, and a parent that controls a large business in music publication." *Showtime*, 912 F.2d at 584; *cf. CBS Remand*, 620 F.2d at 937–38. As for local television stations, the Magistrate Judge found they had "the bargaining advantage of negotiating jointly through their All–

Industry Committee" and the "further advantage that by virtue of their number they represent a much larger source of revenue to ASCAP and a much more difficult industry to police for copyright infringement. These circumstances also suggest that they may be able to negotiate on more equal terms with ASCAP than could the individual cable program suppliers." *Id.* (citations omitted). The facts adduced at this trial showed that the cable industry is not so diffuse, it is nationally organized, and it represents—both in the aggregate and on the individual programming service or system operator or MSO level—a significant source of revenue (and, given the unlicensed status of most of the industry, potential revenue) to BMI and therefore has considerable leverage in any negotiations on this subject.[64]

### 3. Producers' Ties to Publishing Companies

The final impediment plaintiffs identified at trial is the economic disincentive stemming from the fact that producers often receive the publisher's share of music performing royalties resulting from the transmission of their syndicating programming. Here the parties differ on the significance of the monies involved. Defendant points to the Second Circuit's disparagement of this argument on the ground that the distributions by BMI of $0.50 to $0.85 for half-hour individual airplays were insignificant when compared to the returns on syndicated program sales, 744 F.2d at 931. As explained previously, half of every dollar of royalties distributed by BMI goes to the composer (the "writer's share") and half goes to the publisher. Producers of syndicated programming often own or control a publishing entity that becomes the publisher of the original music in their programs and thereby obtain the publisher's share of the royalties. *See* Tr. at 322–24, 388; 1116–18.[65] Plaintiffs argued, then, that be-

---

**63.** The NCTA licensing committee only briefly represented the interests of cable programming services; it has not done so since the early 1980s. J.S. ¶ 2.

**64.** *E.g.* TDC's Rider noted in passing that "[W]e reject probably 80 percent of the programming

that is submitted to us." Rider V.Tr. (P 375A) at 18.

**65.** Indeed, the music catalogs of many publishers consists almost entirely of music written by

cause producers of syndicated programming receive "substantial" economic benefits from these distributions at little cost, they have a vested interest in maintaining the blanket licensing *status quo*.[66]

Defendant elicited testimony undermining this theory, however. TDC's Vice President and Counsel admitted that the Disney Studio does not consider royalties it receives from its wholly-owned publishers to be a factor in whether to issue source licensing for its syndicated programming. Tr. at 146, 149. Even plaintiffs' economic expert conceded that BMI royalty distributions are only a "minor factor" to producers considering source licensing. Tr. at 606. In any event, not all producers own or control publishing companies (20th Century Fox does not own any, Tr. at 202, 599–600) and these producers certainly have no economic interest in the publisher's share of BMI royalties. Finally, the amount of such royalties, even in the aggregate, is minuscule in comparison to the dollar figures involved in syndicated programming transactions. TDC's publisher affiliate, Wonderland Music, earned BMI royalties from cable in the low six figures. J.S. schedule B. In contrast, Disney Studios recently entered into a $500 million deal with just one pay cable programming service. Tr. at 605–06. It is stipulated that the largest earner of cable television royalties from BMI in 1989 received royalties in the low six-figure range, with most of the publishers in the same context earning less than $100,000. Although hardly pennies, these amounts pale in comparison to the millions or hundreds of millions producers of syndicated programming can earn for one film or series. As the Second Circuit observed, "those royalties are a small fraction of their syndication revenue." *Buffalo Broadcasting*, 744 F.2d at 931. Common sense indicates that this economic link between producers and music performing

rights royalties is relatively insignificant and not a barrier to source licensing.

## D.  Rule of Reason Inquiry

■ Even had the Court agreed with plaintiffs that the blanket license does constitute a restraint on trade, it would survive scrutiny under the rule of reason analysis that such a conclusion would require.

At bottom, the rule of reason asks whether the challenged restraint enhances competition. "[I]t focuses directly on the challenged restraint's impact on competitive conditions," *Professional Engineers*, 435 U.S. at 688, 98 S.Ct. at 1363, and thus entails "analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Id.* at 692, 98 S.Ct. at 1365. The history, reasons, and workings of the music licensing industry have already been extensively discussed, *supra*. Accordingly, the Court turns to the blanket license's effects on competition, weighing the anticompetitive effects against the offsetting procompetitive benefits. *See BMI v. CBS*, 441 U.S. at 24, 99 S.Ct. at 1565.

Plaintiffs asserted at trial that the anticompetitive effects of the blanket license are legion, but the actual effects identified are alleged to be (1) the reduction or nonexistence of price competition among composers for cable television music performing rights; (2) BMI's inflated market power and concomitant ability to increase prices above competitive levels; and (3) the shifting of the competitive market from the producer level (where other music and creative rights are negotiated) to the cable programmer and operator level where there is no price competition. The relevant market, it is stated, is that where the selection of music occurs; thus, plaintiffs contend the analysis should be whether the blanket license engenders competition among BMI affiliates. In sum, then, plaintiffs are ar-

---

composers-for-hire for syndicated programming created by the producer who owns or controls the publishing entity. Tr. at 1160–61; Caster Dep. at 26; Weitzman Dep. at 29–30.

**66.** According to earnings figures, the greater part of BMI royalty distributions to publishers deriving from cable and broadcast television goes to producer-publishers. *See* J.S. schedule B; O.S.

guing that the blanket license unlawfully eliminates price competition for music performing rights in syndicated programming.[67]

Rule of reason jurisprudence teaches that "[r]estrictions on price and output are the paradigmatic examples of restraint of trade that the Sherman Act was intended to prohibit." *NCAA*, 468 U.S. at 107–08, 104 S.Ct. at 2963. In the *NCAA* case, the agreement at issue had "significant potential for anticompetitive effects," 468 U.S. at 104, 104 S.Ct. at 2962, because "[i]ndividual competitors lose their freedom to compete. Price is higher and output lower than they would otherwise be, and both are unresponsive to consumer preference." *Id.* at 106–07, 104 S.Ct. at 2963 (footnotes omitted). As to the product there—the right to broadcast college football games on television—the Court observed that "many telecasts that would occur in a competitive market are foreclosed." *Id.* at 108, 104 S.Ct. at 2964. An examination of price and output factors in the case before this Court reveals no such compelling illegalities.

As to price, plaintiffs did not offer concrete evidence as to how the price of these rights is inflated beyond what it would be. While it is understood that there is no price competition between individual composers or compositions, *see CBS Remand*, 620 F.2d at 935, that alone is not conclusive. Plaintiffs did not show that the price of music performing rights in syndicated programs would be lowered, or be more competitive, if the blanket license did not exist. Instead, they offered the testimony of their economic expert, Professor Benston, that the blanket license is a classic monopoly or monopsony and therefore anticompetitive. Tr. at 1206–08. In this regard, it should be

noted that this was not brought as a monopoly case under section 2 of the Sherman Act. Further, that price competition does not exist does not mean that the blanket license is the cause. With the availability of the direct and source licensing, this is a situation where price competition *could* exist—where there are buyers interested in purchasing a product available from two or more sellers. *See CBS Remand*, 620 F.2d at 935.[68]

Plaintiffs believe that BMI's pricing is blatantly illegal. They query whether in a competitive market a BMI composer could obtain three times the performing royalties than his or her ASCAP counterpart receives, or three or four times than is received from broadcast television. This question is interesting, for as their only substantive data on price it indicates a different definition of the relevant market, the one recently identified by the ASCAP rate court in determining a reasonable cable license fee: "[I]f we are to talk of competitive pricing, we must start with the premise that the relevant market is one for aggregate performance licenses, not the market for the services of individual composers and musicians." *Showtime*, 912 F.2d at 591 (Magistrate Judge's opinion). Plaintiffs' comparison between the BMI fees broadcast television licenses and earlier cable and broadcast licenses (including ASCAP rate court determinations), on the one hand, and the one percent fee demands that encouraged this litigation, on the other, are not indicative of anticompetitive pricing. Earlier fees are, of course, going to be at lower levels. Those fees, which were explicitly interim fees, do not represent the appropriate benchmark. Furthermore, the *Showtime* decision covered fees for a four-year period from 1984.

---

**67.** Apparently, these are the same arguments pressed by the plaintiff local television stations in *Buffalo Broadcasting*. There, the trial court—which was ultimately reversed—found that the blanket license had the following anticompetitive effects: "the selling power of one [composer] adds to that of the others and the monopoly of all is enlarged," 546 F.Supp. at 293; it "prevents price competition between and among the pooled compositions;" *id.*; and the price paid by the users is unrelated to the quan-

tity or quality of music used, *id.* at 294 (citing *BMI v. CBS*, 441 U.S. at 31, 99 S.Ct. at 1568 (Stevens, J., dissenting)).

**68.** *See also id.* ("a practice that is not a *per se* violation, and this blanket license has authoritatively been found not to be such, does not restrain trade when the complaining customer elects to use it in preference to realistically available marketing alternatives.").

More importantly, that BMI *sought* certain fee levels does not make it an antitrust violator. An asking price is a bargaining position. There was testimony that this price was simply the opening volley in the negotiation game. For example, the one percent demand to BET was not "frozen in stone," as BMI made clear. P 3M.[69] It is unquestioned that BMI hoped to triple its license revenues, Tr. at 2377–79, but that is even a laudable attempt to increase profits. Its proposed license fee may be "absurdly high," Brenner HBO Dep. at 44–45, but a high demand is a recognized tactic in the competitive marketplace. Furthermore, in view of the fact that price competition *could occur* because, to name one option, source licensing of music rights is available, it is hard to find support for plaintiffs' argument. Lastly, as to price, the Court echoes the remark in *BMI v. CBS* that "[n]ot all arrangements among actual or potential competitors that have an impact on price are *per se* violations *or even restraints.*" 441 U.S. at 23, 99 S.Ct. at 1564 (emphasis supplied).

If negotiation occurred at the point plaintiffs want it—at the source, when producers negotiate the other sticks in the bundle of music rights they acquire in composer-for-hire music [70] or in preexisting music—it is difficult to conclude that there would be more price competition than exists with the blanket license. As stipulated by the parties, there is tremendous competition among composers for such contracts, as there is among proprietors of preexisting music, resulting in widely varying prices for synchronization and other rights. As the Second Circuit observed in *Buffalo Broadcasting*,

> With this degree of price competition for music on syndicated programs already in place, it is entirely a matter of speculation whether replacement of the blanket license with source licensing would add any significant increment to price competition at the point where the syndicators decide which music to use.

744 F.2d at 932–33. That prices are not competitive does not imply anticompetitive behavior. In any event, on this record, the Court cannot determine whether price competition among compositions would be promoted by the elimination of the blanket license. What is apparent, however, is that price competition is not significantly restrained by the blanket license.

Plaintiffs attempted to show that the lack of price competitiveness is a result of, or can be inferred from, the market power of BMI. It is undeniable that BMI is a formidable presence in the music performing rights market, and is certainly perceived to be extremely powerful. But even assuming BMI has monopoly power and uses that power to extract fees, that alone does not constitute anticompetitive behavior in violation of § 1. "[A]n excessive price alone does not establish a violation of the antitrust laws, because imposition of a high price is not, in and of itself, an anti-competitive act." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C.Cir.1987). As the Second Circuit explained in *United States Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988): "Prices not based on superior efficiency do not injure competitors but rather invite competitive entry. . . . 'Setting a high price may be a use of monopoly power, but it is not in itself anticompetitive.'" 842 F.2d at 1361 (citations omitted) (quoting *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980)); *see also Olympia Equipment Leasing Co. v. Western Union Telephone Co.*, 797 F.2d 370, 375 (7th Cir. 1986) ("a firm with lawful monopoly power has no general duty to help its competitors by holding a price umbrella over their heads"), *cert. denied*, 480 U.S. 934, 107 S.Ct. 1574, 94 L.Ed.2d 765 (1987); *Showtime*, 912 F.2d at 587 n. 31 (Magistrate Judge's opinion). Simply put, the fact that

---

**69.** *See also* P 6E (letter from BMI to the Family Channel counsel) ("BMI is certainly willing to discuss any new license fee proposals you may have. . . .").

**70.** As explained *supra,* the vast majority of syndicated programming contains original music created under these composer-for-hire contracts.

BMI has more market power than it would in a hypothetical, more competitive market for music performing rights does not necessarily make its pricing strategy anticompetitive. *Cf. id.*, 912 F.2d at 570 (that plaintiffs in *CBS Remand* and *Buffalo Broadcasting* failed "to prove an antitrust violation does not mean that the Magistrate [Judge] lacked evidence sufficient to support a finding that ASCAP enjoys more market power than it would have in a freely competitive market.") (Second Circuit Opinion).

Moreover, there was no evidence that output was, or is, in any way impeded by the blanket license. Indeed, ample evidence was presented that the blanket license increases output. As explained by defendant's economic expert, the blanket license encourages the use of music by eliminating marginal costs once the music is purchased. Tr. at 2077–78. For example, a composition can be simultaneously consumed by many users. Having to price individual performances or individual compositions would create additional costs, thereby decreasing the total amount of music used.

The Supreme Court focused on this competitively beneficial characteristic of the blanket license, declaring that *"Broadcast Music* squarely holds that a joint selling arrangement may be so efficient that it will increase sellers' aggregate output and thus be procompetitive." *NCAA*, 468 U.S. at 103, 104 S.Ct. at 2961 (citing *BMI v. CBS*, 441 U.S. at 18–23, 99 S.Ct. at 1561–64).[71] "[T]he availability of a package product that no individual could offer enhanced the total volume of music sold.... there was no limit of any kind placed on the volume that might be sold in the entire market and each individual remained free to sell his own music without restraint." *Id.* 468 U.S. at 114, 104 S.Ct. at 2967.

Another procompetitive effect is the tremendous efficiency of the blanket license, which, ultimately, reduces costs to buyers and maximizes output. This beneficial economic effect arises from the elimination of potentially thousands of transactions that would otherwise have to occur, in negotiating licenses, monitoring of use, sales, and enforcement of copyrights. "Individual sales transactions in this industry are quite expensive, as would be individual monitoring and enforcement, especially in light of the resources of single composers." *BMI v. CBS*, 441 U.S. at 20, 99 S.Ct. at 1563. Even outside the context in which blanket licensing arose—to compensate composers for spontaneous, live use of music in a multitude of settings—it *"reduces costs absolutely* by creating a [product] that is sold only a few, instead of thousands of times, and that obviates the need for closely monitoring the [programmers] to see that they do not use more than they pay for. [It] also provides the necessary resources for blanket sales and enforcement, resources unavailable to the vast majority of composers and publishing houses." *Id.* at 21, 99 S.Ct. at 1563 (emphasis supplied, footnotes omitted).[72] Here, evidence was adduced indicating that the blanket license eliminated these costs for composers and publishers because without it, they would need to retain additional personnel to perform the functions performed by BMI (and ASCAP and SESAC): negotiating, monitoring, auditing, and bookkeeping. *E.g.*, Boris V.Tr. (D1111A) at 116–17. Without the benefits of the aggregating function of the blanket license, output would be reduced because individual composers and publishers would not be financially able to accomplish these ends.[73]

---

**71.** The trial court in *Buffalo Broadcasting* declined to ascribe significance to the output factor, because "due to the absence of price competition, uncurtailed supply has no effect on prices." 546 F.Supp. at 294. But, as indicated by the language from the Supreme Court cited in the text, the significance of output is not solely its effect on price.

**72.** These observations led to the Court's conclusion that "a bulk license of some type is a necessary consequence of the integration necessary to achieve these efficiencies, and a necessary consequence of an aggregate license is that its price must be established." 441 U.S. at 21, 99 S.Ct. at 1563.

**73.** It has been argued that the blanket license is transactionally inefficient because of the legal fees incurred in negotiating over blanket license fees and the number of lawsuits on this issue.

As plaintiffs point out, however, transactional efficiencies would not be eliminated were the blanket license replaced by source licensing (but not other alternatives). Producers already negotiate and enter into contracts and licenses with composers and publishers for the acquisition of all the other rights in music; music performing rights would just be part of that same process and therefore no substantial additional transaction costs would be incurred. Defendant admits that if a "complete rights buy-out" were to take place at the source, i.e. when producers license their syndicated programming, these costs would not increase, because the rights would be granted directly (eliminating negotiation costs) and indemnification could be provided at that point. *See, e.g.,* Tr. at 2241–42. In other words, there would be direct royalty distributions, a state of affairs plaintiffs insist is far more efficient than using BMI, whose administrative costs generally range between 15 and 20% of their collections. *See* J.S. ¶ 24. Indeed, the monitoring conducted by BMI primarily serves as a means of determining the proper distribution of fees (rather than as a copyright enforcement mechanism). J.S. ¶¶ 21–22. Plaintiffs also claim that there is already a system in place that would permit the payment for music performing rights based on the success of the production, akin to the "residuals" system used for soundtrack royalties (*e.g.,* P 29A ¶ 7) and videocassette rollover options (*e.g.,* P 39D ¶ 8(a) [74]). Producers do, at times, pay other creative artists 'back-end' compensation—residuals—based on future releases or receipts. Tr. at 398–400; 1128. This arrangement has been used for music performing rights for commercials, Boris V.Tr. (D 1111A) at 97–98, and for music rights for videocassettes and soundtracks, *id.* at 99. Plaintiffs conclude from these facts that the BMI blanket license is costly in comparison to producer source licensing because it creates the need for an elaborate structure for determining who should get paid, a structure that is totally unnecessary in a source licensing marketplace.

But the source licensing scenario is not as rosy as plaintiffs paint it. Plaintiffs' own industry expert explained that up-front buyouts are not preferred by creative artists because it is difficult to predict the commercial success of programming. Tr. at 634–36.[75] Given the resulting difficulty of valuing future performances, composers predictably do not like that type of system. Tr. at 634, 1750–52, 1951–52. As for a residuals system, although preferable to up-front buy-outs, Tr. at 1954, it arose out of a talent guild system that turned out to be unworkable (it worked as a cartel, limiting entry and output) and of questionable legality. Tr. at 2117–20. Absent a guild or similar arrangement, up-front buyouts suffer from some of the inefficiencies of direct licensing, especially as regards monitoring. As defendant's economist explained, individual composers and publishers would have to monitor constantly to ensure that the user does not exceed the scope of the license or underreport the number of performances—there is a disincentive for the producer to comply with the license terms so as to lessen their liability for royalties. Tr. at 2242. Finally, "back-end" profit participation agreements, which some prominent composers have obtained,[76] share many of the same disadvantages, and plaintiffs' expert testified that those type of agreements for other creative artists generate revenue only in the rarest of circumstances. Tr. at 617–21.

That source licensing may be less restrictive—in the sense that it is more efficient and therefore more procompetitive in certain respects than the blanket license— does not make the blanket license unlawfully anticompetitive, especially with the

The relevance of this observation is not apparent.

**74.** This clause provides for a flat sum to be paid if videocassettes are made of the movie, with another flat fee to be paid upon the sale of 50,000 videocassettes, and additional flat fees to be paid each time an additional 50,000 copies are sold.

**75.** Most projects are commercial failures. J.S. ¶ 101.

**76.** *E.g.,* Tr. at 1984, 1993–95; 1746–47.

other factors remaining in the balance, such as transactions that would still have to take place (negotiations over price, enforcement), and in light of the conclusion that blanket licensing is not the only realistic alternative available to plaintiffs.

We must be mindful that we are not dealing here with a conventional product (or conventional market), but intellectual property, the rights to which are governed by statute. The policies of the copyright laws must also be considered. Although the copyright law does not shield intellectual property from antitrust analysis, it does shape the inquiry because it is relevant to the market at issue.[77] As noted by Magistrate Judge Dolinger, one major benefit conferred by the blanket license on licensees is that it "represents, in effect, an insurance policy against copyright liability for the full range of the cable company's acquired programming." *Showtime*, 912 F.2d at 592 (Magistrate Judge's Opinion). While the maximization of music use is not the issue here, the efficiency of the blanket license in promoting the goals of the copyright laws is obvious. It protects copyright holders from infringements and provides them compensation.[78] *See F.E.L. Publications*, 214 U.S.P.Q. at 414.

Part of the reason plaintiffs could not offer convincing evidence stems from the conceptual difficulty in analyzing the competitiveness in the market of a unique product. As noted by the Supreme Court, the product at issue here, the blanket license, is more than the sum of its parts, the licenses to individual compositions. It is "a package product that no individual could offer." *NCAA*, 468 U.S. at 114, 104 S.Ct. at 2967. Even viewing the product as individual

compositions, however, music performing rights fit only awkwardly within the mold of a regular market where price is the key determining factor in selection. Musical compositions are strikingly unique; their value reflects not only the perceived quality of the music but also the reputation of the composer, the popularity of the composition (if preexisting), historical circumstances, and other factors. The testimony revealed that price is simply not the most critical attribute in selection or purchase. *E.g.*, Tr. at 303 (describing process of music selection and synchronization into program soundtracks); Tr. at 1098 (a Walt Disney Studio Vice President testified, "We may get quotations for five songs for the same use, and it's only after they've gone through the final phase of editing and dubbing, and possibly in some cases previewing the picture to see how it plays, that they'll decide on the final song selection.").[79]

## E. Split Licensing

The split blanket license, plaintiffs contend, fails the rule of reason test and, in any event, violates BMI's consent decree. *See* J2 Art. IX(A). The controversy over the split licensing proposal deserves separate treatment, because it is quite apart from the general challenge to blanket licensing for syndicated programming. At the outset, it should be noted that the issue is not as crystallized as plaintiffs claim; they insist that BMI was demanding the split license and not accepting any other alternative. As indicated earlier, that is not the case. Thus, the assessment must be of what amounts to a licensing proposal that represents one option, a fact that immediately removes much of the anticompet-

---

**77.** The Sherman Act has always been discriminatingly applied in light of economic realities, including the realities of the unique market conditions for music performing rights, which were created by the copyright laws. *See BMI v. CBS*, 441 U.S. at 14–15, 99 S.Ct. at 1559–60.

**78.** An examination of the market for synchronization rights—where the plaintiffs seek negotiation—suggested to one writer that "some form of collective licensing is the most efficient and effective means of permitting copyright owners and users to take maximum advantage of statu-

tory performance rights." Comment, Controlling the Market Power of Performing Rights Societies: An Administrative Substitute for Antitrust Regulation, 72 *Calif.L.Rev.* 103, 113 (1984).

**79.** The ASCAP rate court observed that "there is no reason to assume that a perfectly competitive market is the appropriate model for rate setting here, and, in view of the working of the Consent Decree as well as the policies embodied in the Copyright Act, there is some reason to conclude otherwise." *Showtime*, 912 F.2d at 593 (Magistrate Judge's opinion).

itive tinge that might otherwise color the split license.

■ As to whether a split-licensing scheme would run afoul of the antitrust laws, that question has already been answered in the negative. Plaintiffs' thesis that if cable system operators must secure licenses separate from the cable programmers they will have no alternative but to take a blanket license from BMI was simply not proven. To recapitulate, cable system operators *do* have realistically available alternatives. While direct licensing is not among the options, cable system operators have the ability to obtain source licensing and per program licensing. The onus of the effort involved would no doubt lead to demands for source licensing from their immediate suppliers, the cable programmers (indeed, cable operators have consistently sought indemnifications from cable program systems for this purpose [80]).

■ Even were the split license a restraint—and even were there no realistically available alternatives—the split license would survive rule of reason scrutiny. Plaintiffs claim that copyright holders would be shielded from competition as to system operators because the latter have no control over the selection or use of the syndicated programs and no ability to choose among competing programs. But that is a matter between the programmers and the operators; and it was proven at trial that system operators do in fact have choice as to the programming, most notably in the clauses that permit them to edit programming for standards and practices. And, the system operators have formidable power in the market, as is evident from the vertical integration and concentration of economic power and, more importantly, the aggregated bargaining strength they can

exert through their nationwide trade association, plaintiff NCTA. Furthermore, the split blanket license would have procompetitive effects in the same manner that the blanket license does for radio stations, bars, and similar sites (*see Moor–Law*), where the public performers of the music [81] are unaware of what music will be played and there exists a large number of musical compositions that may be played. A blanket license for system operators would also be transactionally efficient since, as cannot be disputed, system operators need music performing rights licenses for their local origination and public access programming and the two types of licenses could be negotiated at the same time. *See* J.S. ¶ 81; Tr. at 987–89. Contrary to plaintiffs' assertion that the split license proposal demonstrates BMI's determination to cartelize the music performing rights market (i.e., an intention to act anticompetitively), it was instead an understandable, if not reasonable, response to the unlicensed status of the greater part of the cable industry, to the failure of almost seven years of negotiations with the NCTA, *see* J.S. ¶¶ 81–85; Tr. at 501–02; 948–49, 952–53—and to the resulting infringements of its affiliates' copyrights.[82]

■ That a split license would not violate the antitrust laws, however, does not dispose of a separate (though related) concern: whether it violates BMI's consent decree, entered into in 1966 as settlement of an antitrust suit brought by the U.S. Justice Department. Although barely mentioned at trial, plaintiffs addressed this issue in their post-trial memoranda. They note that Art. II(4) of BMI's original (1941) consent decree required BMI to grant through-to-the-viewer licenses to radio networks, and that the 1966 decree, in Art.

---

**80.** That they did not obtain these indemnifications is not dispositive either way; no money was offered, Tr. at 435, 694, and the cable programmers believed (incorrectly) that they in turn could not obtain source or other licensing.

**81.** Cable operating systems are publicly performing the music they transmit to their subscribers. *See* 17 U.S.C. § 106(4).

**82.** It bears mention again that all the circumstances are to be considered in a rule of reason analysis. *E.g., Professional Engineers,* 435 U.S. at 690, 98 S.Ct. at 1364 ("Unreasonableness ... could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices"); *accord Continental TV,* 433 U.S. at 49, 97 S.Ct. at 2557.

IX(A), broadened the provision to include television networks as well (television having been in its infancy in the early 1940s). Because cable television did not exist in 1966, and because the apparent intent of the Art. IX(A) proscription was to curb the inordinate power of BMI over down-the-line receivers of network programming, plaintiffs argue that cable system operators, as entities similar to local television network affiliates, are or should be protected by that provision.

Plaintiffs' arguments are given more force by a recent court decision. In *United States v. ASCAP (In the Matter of the Application of Turner Broadcasting System, et al.),* No.Civ. 13–95 (WCC) (S.D.N.Y.), Memorandum and Order July 11, 1991 (*"Application of Turner"*), a decision that issued after the instant case was tried and submitted, United States Magistrate Judge Dolinger ruled that ASCAP's consent decree (J1) requires it to issue a through-to-the-viewer blanket license to cable program services covering not only the programmers' transmission to cable system operators but also the transmission by cable system operators to subscribers.[83] ASCAP, like BMI here, had asserted the right to extract licenses from both cable programmers and operators.[84]

At issue there was the following language from the 1950 decree, which orders ASCAP to issue music performing rights licenses on request:

> To a radio broadcasting network, telecasting network or wired music service ... on terms which authorize the simultaneous and so-called delayed performance by broadcasting or telecasting ... of the ASCAP repertory by any, some or all of the stations in the United States affiliated with such radio network or television network ... and do not require a separate license for each station or subscriber for such performances....

J1 Art. V(A). It was undisputed that this provision requires ASCAP to provide through-to-the-viewer licenses to broadcast television stations. But ASCAP claimed that cable television is not within the terms of the decree and, in any event, is so differently structured (both in terms of technology and financial arrangements) from broadcast television that even a broad reading of the provision would not warrant extending its protections to the cable industry.

The Magistrate Judge rejected these arguments. After an exhaustive examination of the history and development of the decree, including the various parties' intentions, and the general antidiscrimination provisions of the decree (see Art. IV(C)), and using traditional tools for the construction of contracts, the Magistrate Judge agreed with the plaintiff cable programmers that, as they are the functional equivalent of broadcast television networks, and the decree was not unambiguous as to the reach of that provision, they are covered by Art. V(A).

In reaching this conclusion, the Magistrate Judge determined that one of the purposes of the consent decree was to "disinfect" ASCAP as a potential combination in restraint of trade, in violation of the antitrust laws. Mem. & Order at 24. He observed that ASCAP had become a government target "because of its potential ability to control a significant portion of the market for music used in non-dramatic public performances, whether on radio or other settings" *Id.* at 27. The original 1941 decree thus "balanced the playing field to a degree and spared the local stations from facing the unenviable choice of either paying whatever ASCAP demanded or foregoing network programming." *Id.* at 28. "[T]he Decree was designed to limit ASCAP's ability, by pooling copyrights for large amounts of music used in radio broadcasting, to extract unreasonable fees for performance of music." *Id.* The 1950 Decree "extended the specific protections of the 1941 Decree—including both the requirement for one license to cover the pub-

---

83. He also ruled that the decree requires ASCAP to issue perprogram licenses to programming services as an alternative to the blanket license.

84. It is not clear from that opinion whether ASCAP offered other alternatives, as BMI did in the instant case.

lic performance of network programming ... to all forms of mass communication known at the time that might utilize significant amounts of ASCAP music." *Id.* at 30. He characterized the 1950 amendments to the decree as an "effort at inclusiveness," and further noted that "on its face the [1950] Decree appears to apply to television programming transmitted to the public irrespective of the technology used to make the transmission ... [and] also any financial arrangement between the original packager of programming identified with the packager and the entity that transmits that packaged programming to television viewers." *Id.* at 30–31. "[T]he solution adopted by the Decree rests on the fact that the packager has greater ability to negotiate on equal terms with ASCAP than does the affiliated telecaster." *Id.* at 31.

The two technological differences were dismissed as irrelevant. As for transmission via cable or fiber-optics rather than over-the-air signals, the opinion notes, *inter alia,* that most broadcast programming is received via cable. And as for the fact that cable system operators carry dozens of channels whereas local broadcast television stations only carry one network, he observed that it does not make cable any less a part of the business of transmitting television programming into viewers' homes. As for differing financial structures—principally, the different economic posture of the cable industry and the fact that, unlike broadcast television, cable programmers do not pay system operators to transmit their programming—the Magistrate Judge gave them little weight. He found that the virtual monopoly of cable operating systems in their locales did not affect interpretation of Art. V(A), nor did the concentration of ownership among system operators, finding that there was no inevitability to the number of cable system operators in a given area and that cable and broadcast television compete directly for audience, programming, and advertising and that ownership was not an issue in the decree. *Id.* at 54–55, 59–60. As to the differing revenue collection methods, he stated that the original decree was not concerned with sources of income for the networks; "[w]hat mattered was that the networks controlled the assembling of a significant body of programming and transmitted it to a separate entity—the local station—for rebroadcast." *Id.* at 58.

In sum, then, the Magistrate Judge took a functional approach to decree appropriation. "[I]n their relationship with the local system operators—which is the only relationship currently at issue in this proceeding—the program suppliers play the same role as the networks in distributing programming to local cablecasters for transmission under their name to a local television audience. It is this division of function that led the drafters of the 1950 Decree to apply the 'licensing at the source' requirement to television...." *Id.* at 60. Accordingly, he concluded that cable programmers are "telecasting networks" within the meaning of Art. V(A) and are therefore entitled to through-to-the viewer licenses.[85]

Although the parties in this case have not fully briefed the significance of the *Application of Turner* decision with regard to BMI's split license, the question whether BMI's consent decree permits it to impose split licensing is nonetheless properly before this Court. As noted above, plaintiffs here did argue the issue of BMI's consent decree (raising substantially the same arguments as the applicants in that case), and the short response by defendant to Magistrate Judge Dolinger's decision[86] points to the identical arguments they ad-

**85.** Although the U.S. Justice Department (invited to brief the issue to that court) ultimately concluded that ASCAP should not be required to issue through-to-the-viewer licenses to cable television, it did observe that had cable existed in 1950, the government would have sought to include it in Art. V(A), but ASCAP might not have consented to that inclusion. *See* Memorandum for the United States on Decree Construction Issues at 7, *Application of Turner,* attached as Appendix C to Plaintiffs' Post-Trial Memorandum of Law.

**86.** *See* Memorandum of Defendant and Counterclaim-Plaintiffs concerning ASCAP Rate Court Decision, filed July 26, 1991.

vanced to justify their dual licensing approach.

The applicable provision in the BMI decree reads:

> Defendant shall not license the public performance of any musical composition or compositions except on a basis whereby, insofar as network broadcasting by a regularly constituted network is concerned, the issuance of a single license, authorizing and fixing a single license fee for such performance by network broadcasting, shall permit the simultaneous broadcasting of such performance by all stations on the network which shall broadcast such performance, without requiring separate licenses for such several stations for such performance.

J2 Art. IX(A). When this decree was entered into, cable television did not exist, and therefore the lack of any mention of it is not relevant. Nor are the terms "network broadcasting" or "regularly constituted network" defined. Nonetheless, the Court concludes that this provision applies with equal force to the cable television industry.[87] It is clearly within the spirit of the decree to so read Art. IX(A). And it is also common sense. Although it was earlier concluded that cable system operators do have realistic alternatives to the blanket license available to them, the question was much closer as to them than as to the cable program services, most notably because their actual options are fewer (direct licensing is clearly unrealistic) and because of their place in the sequence of events that

leads to the ultimate transmission of programming to the viewer. Their relative power in the marketplace may be considerable, but so is BMI's when it comes to license the vast array of programming carried by system operators. These concerns, while insufficient to constitute an antitrust violation, are plainly the concerns that prompted the through-to-the-viewer provision for radio and television networks. Finally, the functional analysis of the rate court is persuasive. The split blanket license offered by BMI as one alternative is, therefore, unlawful because it violates BMI's consent decree.

\* \* \*

In sum, the complaints will be denied and dismissed.[88]

## III. THE COUNTERCLAIM

Defendant BMI, as well as a number of its affiliated music publishers (hereinafter "publisher counterclaim-plaintiffs"),[89] have asserted copyright infringement claims against plaintiffs (counterclaim-defendants) TDC and BET for the unlicensed use of their music.[90] As the copyright proprietors, these entities have standing to sue for the infringement of their rights under the Copyright Act. 17 U.S.C. § 501.

It is undisputed that these cable programmers transmitted programming with the specific compositions listed.[91] Indeed, TDC and BET do not dispute that those transmissions received via satellite home dishes are public performances.[92]

---

87. While the Magistrate Judge's excellent opinion has been highly informative, this Court independently assessed the evidence of this case before reaching a similar result.

88. There will be, inevitably, future rate disputes between BMI and cable industry licensees. Although not a matter presently before the Court, it bears mention that all parties would apparently benefit from the mechanism of a rate court comparable to the one utilized for ASCAP.

89. The publisher counterclaim plaintiffs are the following: Irving Music, Inc.; Gil Music Corp.; Michael Jackson d/b/a Maclen Music; Tree Publishing Co.; SBK Unart Catalog, Inc.; Screen Gems–EMI Music, Inc.; Beechwood Music Corp.; Dick James Music, Inc.; Duchess Music Corp.; Barry Alan Crompton Gibb, Robin

Hughes Gibb, Maurice Ernest Gibb, a partnership d/b/a Gibb Brothers Music; Cherio Corp.; EMI Unart Catalog, Inc.; ABKCO Music, Inc.; Stone Agate Music, a division of Jobete Music Co., Inc.; EMI Affiliated Catalog Inc.; EMI Blackwood Music Inc.; and Ensign Music Corp.

90. The counterclaims list the publicly performed musical compositions in a schedule attached to each complaint.

91. Claims are made as to forty-four compositions that were publicly performed by TDC and five compositions that were publicly performed by BET.

92. Plaintiffs' Post–Trial Memorandum at 80 n. 38.

Yet, counterclaim-defendants assert that in transmitting their signals to cable system operators they have not "publicly performed" the music contained therein within the meaning of the Copyright Act. *E.g.*, Isakoff V.Tr. (P376A) at 55.

To "perform" a work under the Act means "to recite, render, play, dance, or act it, either directly or by means of any device or process." 17 U.S.C. § 101. The Act states that to perform "publicly" means to perform "at a place open to the public" or to "transmit or otherwise communicate a performance . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." *Id.*

Plaintiffs argue there is no support in the Act or its legislative history for ruling that cable programmers' transmissions to cable system operators are public performances. They point to the House Report accompanying the Act, which they claim establishes that a certain occurrence may be a performance, such as any act by which a performance is "transmitted, repeated, or made to recur," but that such a performance "would not be actionable as an infringement unless it were done 'publicly' as defined in section 101." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 63, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5676–77. To permit liability for infringement for any transmission that may facilitate the public performance of a copyrighted work, but is only directed to a private facility, they claim, is counterintuitive. Such an approach would be duplicative and would force every entity playing a role in bringing a copyrighted work to the public to compensate copyright proprietors.

Plaintiffs' argument proves too much and too little. Not every entity playing a role in transmission is liable; only those transmitting "by means of any device or process" would be. Further, their reading ignores the language and the intent of the Copyright Act. The identical argument has been rejected previously for those rea-

sons. In *David v. Showtime/The Movie Channel, Inc.*, 697 F.Supp. 752 (S.D.N.Y.1988), the issue before the court was whether the transmission of copyrighted material by a cable programming service (SMC) to an intermediary—cable system operators—for ultimate transmission to the public falls within the scope of the Copyright Act. After examining the legislative history, the court concluded that the term "public performance" was meant to be read broadly, along with all the elements of the Act. *Id.* at 758–59. That court's reading and its reasoning are thorough and persuasive.

> Congress intended the definitions of 'public' and 'performance' to encompass each step in the process by which a protected work wends its way to its audience. Moreover, it would strain logic to conclude that Congress would have intended the degree of copyright protection to turn on the mere method by which television signals are transmitted to the public. . . . [W]hether SMC intended to route the protected work to the public's living rooms through a local cable company or through a transmitter atop a mountain. . . . SMC would be transmitting the copyright holder's works to the public and benefitting by those acts.

*Id.* at 759. *Accord Coleman v. ESPN, Inc.*, 764 F.Supp. 290, 294 (S.D.N.Y.1991); *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Systems*, 746 F.Supp. 320, 328–29 (S.D.N.Y.1990) (*Hearst/ABC*). This Court agrees with the *David* court and holds that transmission by cable programmers of programming containing copyrighted music constitutes public performance of that music, and that they are therefore liable for infringement for performing those works without authorization.

Plaintiffs insist that, even if they are infringers, they cannot be liable because BMI engaged in copyright misuse. Copyright misuse is an affirmative, equitable defense to infringement that has grown out of the recognized doctrine of patent misuse. Defendant responds that the doctrine of copyright misuse does not exist.

The patent misuse doctrine denies a patent holder the right to collect for infringement where the holder uses its right to violate the antitrust laws or otherwise abuses the monopoly power granted it by the patent. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 139, 89 S.Ct. 1562, 1585, 23 L.Ed.2d 129 (1969). The policies underpinning this doctrine would seem to apply with equal force to the copyright laws, and so the Fourth Circuit has held. In *Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970 (4th Cir. 1990), the copyright misuse defense was allowed to be raised in an attempt to bar the holder of a copyright in computer software from obtaining infringement relief. Other courts, as well, have recognized the doctrine. *E.g., United Telephone Co. v. Johnson Publishing Co.,* 855 F.2d 604, 612 (8th Cir.1988); *Supermarket of Homes, Inc. v. San Fernando Valley Board of Realtors,* 786 F.2d 1400, 1408 (9th Cir. 1986); *F.E.L. Publications,* 214 U.S.P.Q. at 413 & n. 9; *Mitchell Bros. Film Group v. Cinema Adult Theater,* 604 F.2d 852, 865 (5th Cir.1979), *cert. denied,* 445 U.S. 917, 100 S.Ct. 1277, 63 L.Ed.2d 601 (1980); *Coleman,* 764 F.Supp. 290, 295; *Moor–Law,* 527 F.Supp. at 772–73. Indeed, in a copyright infringement action brought by BMI, the district court denied BMI's motion to dismiss the affirmative defense of copyright misuse, holding that it cognizable. *Hearst/ABC,* 746 F.Supp. at 328.

That this Court recognizes the equitable defense of copyright misuse, however, does not help plaintiffs. Plaintiffs' burden in this regard is too great. First of all, their failure to show violation of the antitrust laws makes it more difficult to conclude that BMI and the publisher counterclaim plaintiffs have misused their copyrights. While such a violation is not a prerequisite to showing misuse, *see, e.g., Lasercomb,* 911 F.2d at 978, its absence means that plaintiffs must otherwise show that BMI somehow illegally extended its monopoly or otherwise violated the public policy underlying copyright law. No such showing was made here. *Cf. Moor–Law,* 527 F.Supp. at 773 (relevant issue is whether contested feature of licensing is a product of the convenience of the parties or of an effort by the copyright holder to extend its monopoly unlawfully). Plaintiffs point to BMI's market power as the aggregate licensor of its thousands of members and the purported anticompetitive effects resulting therefrom. But, as discussed, any anticompetitive effects that the blanket license may engender are outweighed by the beneficial effects of that system-effects that promote, rather than hinder, the important public purposes of the Copyright Act: the compensation of copyright proprietors for the public performances of their works.

Lastly, plaintiffs maintain that BMI and the publisher counterclaim-plaintiffs should be estopped from asserting infringement because they have "unclean hands," i.e., because of their purportedly anticompetitive behavior. The doctrine of equitable estoppel denies a party's right to assert a claim because of that party's act or omission. Unclean hands calls for the denial of an otherwise meritorious claim where the claimant has acted so improperly as to make punishment of the claimant outweigh the defendant's unlawful conduct. *See generally Hearst/ABC,* 746 F.Supp. at 329–30; *Coleman,* 764 F.Supp. 290, 295–96. As noted by the *Hearst/ABC,* court, unclean hands is recognized "only rarely" in copyright cases, where the copyright holder's "transgression is of serious proportions and relates directly to the subject matter of the infringement action" 746 F.Supp. at 329 (quoting 3 *Nimmer on Copyright* § 13.09[B] at 13–145 (1988)).

Plaintiffs/counterclaim defendants rely for this proposition on the case of *Tempo Music, Inc. v. Myers,* 407 F.2d 503 (4th Cir.1969). There, the defendant successfully raised these affirmative defenses to an infringement action by an ASCAP member because ASCAP had refused to provide a list of its repertory to the defendant, who then had inadvertently infringed the plaintiff's copyright. In other words, the defendant there had attempted not to infringe, but the illegal actions of plaintiffs' agent—ASCAP's consent decree requires it to provide repertory lists—had forced defendant to do so.

For plaintiffs/counterclaim defendants here to succeed with the defenses of equitable estoppel and unclean hands, then, requires them to show at least the responsibility of BMI for their infringements, as well as unlawful conduct by BMI. Plaintiffs advance three assertions in this regard: (1) BMI's exorbitant fee demands to BET for a blanket license and to TDC "only" for a split license; (2) BMI's alleged violation of the antitrust laws and of articles VIII(A) and IX(A) of its consent decree; and (3) BMI's conduct that purportedly precluded any other licensing thereby forcing plaintiffs either to take the blanket license or infringe.

Had these assertions been proven, it might have been possible to conclude that counterclaim plaintiffs assisted in bringing about TDC's and BET's unlicensed status and, perhaps, their infringements. But the evidence at trial does not permit such findings. It is clear that the asking price was only an initial demand to which plaintiffs did not fully respond and that split licensing was not the only alternative offered. BMI would violate its consent decree if it absolutely insisted on split licensing, but it has not done so.[93] Its attempt could be characterized as a good-faith, if misguided, new approach. No preclusion of other licensing options having been demonstrated,[94] nor antitrust violation or otherwise unlawful anticompetitive behavior shown, these defenses are valueless.

Defendants TDC and BET infringed counterclaim-plaintiffs' copyrights. There remains, however, the question of damages. Defendant-counterclaim plaintiffs requested statutory damages, see 17 U.S.C. § 504(c), and, on the basis that plaintiffs willfully infringed, they ask the Court to enhance those damages to the statutory maximum of $100,000 per work infringed, see id. 504(c)(2). Willfulness in this context is established where the infringer knows that his or her action constitutes infringement. *Fitzgerald Publishing Co. v. Baylor Publishing Co.*, 807 F.2d 1110, 1115 (2d Cir.1986). The willfulness of TDC's and BET's infringement here is obvious. Syndicated programming carried (and scheduled to be carried) by both services admittedly includes music from the BMI repertory. J.S. ¶ 44. TDC's license expired on December 31, 1989, but it continued transmitting programming, id. ¶ 77, Tr. at 142; and BET has never had a BMI license. J.S. ¶ 79.

It is appropriate, therefore, that statutory damages be awarded, but in a sum, at $45,000 per work, less than the maximum requested. Accordingly, statutory damages are $1,980,000 against TDC for the forty-four compositions infringed, and $225,000 against BET for the five compositions infringed.[95]

## IV. CONCLUSION

Accordingly, as set forth in the findings of fact and conclusions of law recited above, it is hereby

ORDERED that the complaints are denied and dismissed. It is

FURTHER ORDERED that the defendant-counterplaintiffs' prayers are granted and a separate judgment has issued this date. It is

FURTHER ORDERED that the parties exert their best efforts to resolve the question of attorney's fees under 17 U.S.C. § 505. In the event that they are unable to reach prompt agreement, the issue shall be briefed as follows: defendant-counterclaim plaintiffs' motion shall be filed no later than September 16, 1991; plaintiffs' opposition, no later than October 7; the reply, if

---

**93.** Nor was a violation of the decree's antidiscrimination provision (Art. VIII(A)) shown.

**94.** In *Hearst/ABC*, the court denied a motion to dismiss the equitable estoppel and unclean hands defenses to an infringement action because if it were proven that the cable programming service were truly unable to obtain licenses other than the BMI blanket license, these defenses could be raised. 746 F.Supp. at 329. That ruling does not support plaintiffs here.

**95.** The issue of attorney's fees shall be briefed according to the schedule set forth in the ordering paragraphs.

any, no later than October 14.[96]

96. Should an appeal be timely noted, then the briefing of attorney's fees shall be deferred until conclusion of the appellate process.